In the Matter of the POWER AUTHORITY OF THE STATE OF NEW YORK, Petitioner, v ROBERT F. FLACKE, as Commissioner of the New York State Department of Environmental Conservation, et al., Respondents, and CATSKILL CENTER FOR CONSERVATION AND DEVELOPMENT, INC., et al., Intervenors-Respondents.

In the Matter of the POWER AUTHORITY OF THE STATE OF NEW YORK, Appellant, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Respondent, and CATSKILL CENTER FOR CONSERVATION AND DEVELOPMENT, INC., et al., Intervenors-Respondents.

Third Department, June 9, 1983

APPEARANCES OF COUNSEL

*Stephen L. Baum* (*Charles M. Pratt* of counsel), for appellant.

*Robert Abrams, Attorney-General* (*Lawrence A. Rappoport* of counsel), for respondents.

*Raggio, Jaffe, Kayser & Hunting* (*Robert C. Stover* and *Stanley Bryer* of counsel), for intervenors-respondents.

*George J. Pulver, County Attorney* (*Charles J. Brown* of counsel), for County of Green, *amicus curiae.*

*Charles H. Schaefer* for Town of Prattsville, *amicus curiae.*

### OPINION OF THE COURT

KANE, J.

In or about April, 1976, the Power Authority of the State of New York (the Authority) applied to the Federal Energy Regulatory Commission (FERC) (formerly the Federal Power Commission) for a license to construct and operate a hydroelectric pumped storage power facility at Prattsville, New York. The proposed facility would use the Schoharie Reservoir on Schoharie Creek as the receiving reservoir. A new reservoir would be built at a higher elevation on Dog Hill, an elevated plateau adjacent to the existing reservoir. When demand for electricity is low, such as at night and on weekends, water from the Schoharie Reservoir would be pumped uphill to the Dog Hill Reservoir for storage. When demand for electricity is high, water would be allowed to flow downhill from the Dog Hill Reservoir, through a shaft, and through turbines where it would generate electricity. The water would then be discharged through a tailrace into the Schoharie Reservoir, which is part of the New York City water supply system.

Water from the Schoharie Reservoir passes through the Shandaken Tunnel into Esopus Creek, which in turn flows

into the Ashokan Reservoir in Ulster County. From there, water flows through the Catskill Aqueduct to New York City. Both the Schoharie Reservoir and Esopus Creek between the Shandaken Tunnel outlet and the Ashokan Reservoir are designated class A waters (6 NYCRR 879.6, Table I, Item No. 5; 6 NYCRR 862.6, Table I, Item No. 555), with Esopus Creek, a renowned trout fishery, being subject to Standard A(T) for trout waters.

On May 27, 1977, the Authority applied to the New York State Department of Environmental Conservation (DEC) for certification pursuant to section 401 of the Federal Water Pollution Control Act (FWPCA) (US Code, tit 33, § 1341; as amd by Clean Water Act of 1977). Pursuant to this certification process (commonly referred to as section 401 certification), the Authority must provide the FERC with certification from the State that the proposed energy facility will comply with State water quality standards and effluent limitations.

In May, 1978, the Authority and DEC entered into a memorandum of understanding which deferred the section 401 certification process until after completion of the FERC licensing hearing. This memorandum provided for utilizing the record developed during the FERC hearings for the section 401 certification process before DEC.

In April, 1980, intervenors-respondents petitioned DEC for a declaratory ruling pursuant to section 204 of the State Administrative Procedure Act and 6 NYCRR 619.1. Intervenors-respondents sought a ruling, based upon certain hypothetical facts, as to whether the proposed facility would generate discharges requiring section 401 certification, whether these discharges would constitute thermal discharges, and whether the discharges require State Pollutant Discharge Elimination System (SPDES) permits pursuant to the Environmental Conservation Law.

DEC issued a declaratory ruling on November 26, 1980. This ruling stated, *inter alia,* that the water flowing from the upper reservoir back into the Schoharie Reservoir would constitute a "discharge into the navigable waters", thus requiring section 401 certification, and that this could amount to a "thermal discharge" if certain conditions

resulted because of the discharge. The ruling also stated that the discharge could result in an impairment of the best usage of the Esopus Creek, and that the discharge into the Schoharie Reservoir would require a SPDES permit if the discharge resulted in an increase in the water temperature of the reservoir. DEC assumed, for purposes of the ruling, that the facts set forth in the petition were correct. It was assumed, for instance, that the discharges from the proposed facility would, in fact, cause an increase in the temperature of the receiving body of water.

The Authority commenced a proceeding pursuant to CPLR article 78 to annul the declaratory ruling. By decision dated April 8, 1982, this court annulled DEC's declaratory ruling, holding that DEC did not have the authority to issue a declaratory ruling based upon hypothetical facts and further that DEC violated its memorandum of understanding with the Authority by issuing the ruling prior to completion of the FERC hearings (*Matter of Power Auth. of State of N.Y. v New York State Dept. of Environmental Conservation,* 86 AD2d 57). By decision dated March 30, 1983, the Court of Appeals reversed this court's annulment of the declaratory ruling, holding, *inter alia,* that DEC had authority to issue a declaratory ruling based on assumed facts (58 NY2d 427). Accordingly, the Court of Appeals remitted the matter to this court for its consideration of the merits and of the effect of DEC's subsequent denial of section 401 certification. In this regard, since DEC's subsequent determination of April 9, 1982 (detailed *infra*), was based upon actual facts, we find that this later ruling rendered academic DEC's prior determination premised upon hypothetical facts.[1]

The FERC hearings commenced on July 10, 1980 and concluded on October 28, 1981, and a lengthy and comprehensive initial decision of the presiding administrative law judge was filed on July 6, 1982. The section 401 certification hearing commenced before a DEC administrative law judge (ALJ) on February 23, 1982 and concluded on March 4, 1982 (the record from the FERC hearings was utilized by DEC in the section 401 certification process). On April 9,

---

1. As respondent commissioner stated in his April 9, 1982 ruling: "The ample factual record in this case eliminates the question of hypothetical or assumed facts."

1982, the day after this court annulled DEC's declaratory ruling (*Matter of Power Auth. of State of N. Y. v New York State Dept. of Environmental Conservation, supra*), DEC, by its commissioner, issued a determination denying the Authority's section 401 certification application.

That determination of respondent commissioner adopted, with only one variation, the interim report of the ALJ. This interim report outlined the following reasons why the section 401 certification should be denied.

Initially, with regard to the quality standards for fresh surface waters in this State (6 NYCRR 701.4), the ALJ found that the turbidity standards for the Schoharie Reservoir and Esopus Creek would not be violated because any increase in turbidity as a result of facility operations would not be visible. Further, the ALJ determined that facility operations would not cause the deposition of any suspended, colloidal or settleable solids in the water bodies (see 6 NYCRR 701.4) despite the fact that there would be solids in the discharge waters. However, it was determined that an extension of elevated levels of turbidity (resulting from elevated levels of solids) arising from facility operations after "storm events" would violate the "best usage" standards applicable to these waters (6 NYCRR 701.4). Facility operations following storm events would cause an extension of periods of increased turbidity in the waters of the Schoharie Reservoir and Esopus Creek. This would mean a decrease in the penetration of sunlight into the waters and a decrease in the production of subaqueous biota that is dependent on sunlight. The result would be a decrease in the quantity of material available in the respective food webs of the fisheries of the bodies of water and would thus be deleterious to those fisheries.

The ALJ found that during the summer period, the Schoharie Reservoir stratifies into an upper layer of warm water, called the epilimnion (see 6 NYCRR 652.10 [l]), a lower layer of cool water, called the hypolimnion (see 6 NYCRR 652.10 [m]), and a third layer, between the epilimnion and hypolimnion, called the thermocline, consisting of a narrow stable layer of water where temperatures drop rapidly with depth (see 6 NYCRR 652.10 [k]). The elevation of the thermocline decreases in the summer as cool

water is discharged through the Shandaken Tunnel. The ALJ found that facility operations would further lower the elevation of the thermocline and reduce the amount of cool water in the hypolimnion. Further, facility operations would cause daily surface water level fluctuations of from 8 to 13 feet and up to 24 feet on a weekly basis, thereby exposing fish spawning and fish food supply areas. Based on these findings, the ALJ concluded that facility operations would disrupt the Schoharie Reservoir's natural seasonal cycle (6 NYCRR 704.2 [a] [1]) and would violate the best usage of the reservoir (6 NYCRR 701.4).

The ALJ also found that the facility would have adverse effects on Esopus Creek. The Authority's predictions of the effects of the facility on Esopus Creek depend largely on the use of a cool water pipe which is designed to transport cool water from lower elevations of the Schoharie Reservoir (the hypolimnion) to Esopus Creek. The ALJ found that even with the use of this cool water pipe, downstream temperatures of the creek would be 5 to 10 degrees Fahrenheit higher during the summer period. At one sampling point in the creek, temperatures would exceed 70 degrees Fahrenheit. It was concluded that facility operations would increase temperatures in the creek by more than 2 degrees Fahrenheit, a result prohibited by 6 NYCRR 704.2 (b) (2) (ii). It was also concluded that this would result in a change in the natural seasonal cycle of the creek as it currently exists, apparently in violation of 6 NYCRR 704.2 (a) (1).

The ALJ next concluded that facility operations would violate the best usage standards of 6 NYCRR 701.4 as applied to Esopus Creek because the higher temperatures would have adverse impacts upon the trout population of the creek.

In passing upon the facility's effects upon Esopus Creek, the ALJ noted that the proposed cool water pipe could provide only a limited amount of cool water to control temperatures in the creek with absolutely no margin for error. If actual operations differed from projections, with less cool water available from the reservoir than projected, the result would be even higher temperatures in the creek.

The Authority, in its section 401 certification application, applied for a modification of the water quality criteria pursuant to 6 NYCRR 704.4. Respondents denied the requested modification, concluding that the Authority had not demonstrated that the water quality standards were unnecessarily restrictive as to the proposed project (see 6 NYCRR 704.4 [c]). Respondents also denied the Authority's application for a SPDES permit.

The second proceeding (No. 43801), which is the subject of the following discussion, was then commenced by the Authority.

In our view, a resolution of the important issues presented requires careful consideration of the July 6, 1982 initial decision of FERC, previously mentioned. That 135-page decision carefully documented the disposition of every conceivable issue unveiled in a record consisting of 17,000 pages and 764 exhibits, and arrived at conclusions diametrically opposite to those of respondent commissioner. Those conclusions were supported by impressive expert testimony submitted on each issue, and, in strong language, the decision rejected arguments advanced by respondents, concluding that they were without merit. For example, in considering Esopus Creek temperature impact, it states that "this records [sic] warrants the inexorable conclusion that project operation will not alter optimal conditions for trout growth in Esopus Creek during the period when optimal growth occurs". Similar descriptive and decisive language disposed of other controverted issues. In the end, the ultimate finding and order of FERC authorized the issuance of a license to the Authority for the Prattsville project, subject (1) to the required State section 401 certification, and (2) to 48 other provisions establishing special conditions for the construction, operation and monitoring of the project during and after the course of construction. Particular emphasis was placed upon a content study of the quality of the water supply from the reservoir and the necessity of flexibility at all stages of the project's operation, with an eye toward such reasonable changes as may be required to maintain acceptable forms of aquatic and human environment. Further emphasis was placed upon a five-year comprehensive study of the operation of the cool

water pipe to determine its effectiveness and the need for any modification. However, as significant as these factual determinations may be to a resolution of this controversy, of paramount importance is FERC's discussion of its duties, as mandated by Congress, to implement the provisions of the Federal Power Act and the Clean Water Act in the licensing process. Recognizing that appropriate State agency certification of compliance with applicable State water quality standards is a prerequisite to the ultimate issuance of a license (US Code, tit 33, § 1341, subd [a], par [1]), FERC noted that the Federal Power Act required, in its review of development proposals, that it explore all issues relevant to the public interest, which include future power demand and supply, alternate sources of power, as well as the public interest in preserving rivers, fish and wilderness for recreational purposes (*Udall v Federal Power Comm.*, 387 US 428, 450). What we perceive to be of critical consequence is that the Federal Power Act mandates a balancing of all relevant factors to determine if, on balance, the public interest could be best served by the development proposal before it. If this is found to be the case, FERC is then authorized to issue a license for the use of the public's water resources (US Code, tit 16, § 797, subd [e]). In such a process, broad discretion is vested in the FERC to grant licenses and to impose conditions it deems appropriate (*Niagara Mohawk Power Corp. v Federal Power Comm.*, 379 F2d 153, 158).

It is abundantly clear that FERC meticulously followed this procedure in its grant of a license to petitioner. Nevertheless, respondent Flacke[2] precipitately vetoed the action of the FERC upon what we view as dubious logic in the interpretation of his own regulations and the evaluation of the massive evidence in the record before him. There is no mention of the public interest, of balancing countervailing factors, or the requirements of the Energy Law of this State, which articulates this State's general policy in energy-related matters and imposes certain duties upon agency heads such as respondent commissioner.

---

2. Robert Flacke was Commissioner of the State Department of Environmental Conservation at all times relevant to the facts of this case. Although Flacke was named as a respondent in this proceeding, the current commissioner has been substituted in his place by order of this court.

The law of this State, addressing the question of administrative agency conformance with State energy policy, provides: "Every agency of the state shall conduct its affairs so as to conform to the state energy policy expressed in this chapter" (Energy Law, § 3-103).

That policy, described in statutory language, provides, among other things, for a comprehensive long-range energy plan (Energy Law, § 3-101, subds 1, 7). Such a plan has been adopted and this particular project is an integral part of that plan. It is the only project which, theoretically and within the time frame provided, can satisfy the established need for a 1,000 megawatt pumped storage hydroelectric facility. Of more than passing interest is the fact that the Energy Planning Board, which adopted the State Energy Master Plan (SEMP) on March 25, 1982, included, as a member, respondent Commissioner Flacke, who, in dissenting from that board's decision with regard to the need for a pumped storage hydroelectric facility observed: "Even if such a need were demonstrated, the site-specific record compiled for any such facility must support a conclusion that on balance the need identified in the SEMP outweighs the adverse impact of the project."

Despite the prior recognition of the necessity to balance the need for a project against the environmental impacts of that project, respondent commissioner herein determined that such a balancing process cannot occur. He apparently located support for this view in his counsel's affidavit, which states that section 401 certification authorizes respondent commissioner to consider only whether the proposed facility complies with State water quality standards and effluent limitations, and that consideration of whether the proposed facility complies with SEMP would be outside the jurisdiction of the commissioner because SEMP does not pertain to water quality.

In our view, such a conclusion is not only unrealistic, but legally flawed. Similar circular reasoning is found in the commissioner's strained construction of his own regulations, when he concludes that the transmittal of water from a lower to upper reservoir and its return is the "discharge of a pollutant" culminating in "industrial waste". However, we need not consider the doubtful valid-

ity of these conclusions further, for it seems clear to us that when the Legislature directs an agency of the State to conduct its affairs in such a manner that it act in the public interest with respect to any energy project that meets the requirements of the State's long-range plan, it must do just that. This can only be done by a careful weighing of the environmental impact in light of the over-all public interest in the matter under review. Such considerations were exhaustively reviewed by the presiding administrative law judge for the FERC.

In conclusion, we find the commissioner's determination denying petitioner's applications unacceptable for the reasons stated, and direct that this matter be remitted for further consideration. We note, with reference to the commissioner's mention of the State Environmental Quality Review Act in his decision, that we perceive no need for further proceedings under ECL article 8 in view of the proceedings before FERC and the contents and findings of its order and decision of July 6, 1982 (ECL 8-0107, 8-0111, subds 2, 3).

The determination should be annulled, without costs, and the matter remitted to respondents for further proceedings not inconsistent herewith.

The appeal from the judgment entered July 29, 1981, should be dismissed, as academic, without costs.

SWEENEY, J. P., MAIN, CASEY and WEISS, JJ., concur.

Determination annulled, without costs, and matter remitted to respondents for further proceedings not inconsistent herewith.

Appeal from judgment entered July 29, 1981, dismissed, as academic, without costs.