■ In the Matter of POWER AUTHORITY OF THE STATE OF NEW YORK, Petitioner, v HENRY WILLIAMS, as Commissioner of the New York State Department of Environmental Conservation, et al., Respondents, and CATSKILL CENTER FOR CONSERVATION AND DEVELOPMENT, INC., et al., Intervenors-Respondents. — Proceeding pursuant to CPLR article 78 (transferred to this court by order of the Supreme Court at Special Term, entered in Albany County) to review a determination of the Commissioner of Environmental Conservation which (a) denied certification of a proposed hydroelectric generating project pursuant to section 401 of the Clean Water Act, and (b) denied petitioner's application for a State Pollutant Discharge Elimination System permit pursuant to ECL article 17. ¶ This matter has been remitted to us for further consideration by the Court of Appeals (60 NY2d 315, revg 94 AD2d 69). Issues concerning this matter have been before this court (94 AD2d 69) and the Court of Appeals (58 NY2d 427) on prior occasions, and reference is made thereto for a more detailed recitation of the factual background and questions presented. ¶ On this occasion, we have been directed by the Court of Appeals to consider issues heretofore raised other than petitioner's contention that respondent Commissioner of Environmental Conservation erred in not considering energy and general environmental factors, as well as conformity to water quality standards in making his decision on petitioner's application. ¶ Accordingly, we first address the question of whether there is, from the entire record, substantial evidence to support the determination of the Commissioner as it relates to water quality standards. In other words, does this record contain sufficient proof to answer the narrow question of whether there is "reasonable assurance" that the construction and operation of the proposed project will violate applicable water quality standards of the State (*Matter of de Rham v Diamond,* 32 NY2d 34, 44). The Commissioner based his decision on the technical-scientific ground that petitioner failed to sustain its burden of proof that the proposed project meets the standards and criteria set forth in his regulations. Thus, our review on this issue is limited to whether there is sufficient proof within the whole record to reasonably persuade an objective fact-finder of that ultimate fact decided (*300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176). The issues presented are technical and complex. They generated volumes of expert testimony and hundreds of exhibits. The experts disagreed on many issues such as turbidity, water temperature, and the effect and location of a "cool water pipe" to help assure that the water temperature in the Shandaken Tunnel, leading from the Schoharie Reservoir to the Esopus Creek, would remain at a satisfactory level. In their respective decisions, the Federal Energy Regulatory Commission and the Commissioner arrived at diametrically opposite conclusions on these and many other issues, requiring us to examine closely the arguments advanced by all parties to this proceeding. In the final analysis, however, the question we must answer is, simply stated, whether the evidence presented provides any rational basis for the determination as made. Essentially, it is petitioner's argument that the evidence presented through its witnesses is more credible and persuasive than that presented by other parties. The efficacy of that argument notwithstanding, the choice of conflicting expert testimony rests in the discretion of the administrative agency (*Matter of City of New York v Larocca,* 97 AD2d 666; *Matter of Lovett v Flacke,* 83 AD2d 718, mot for lv to app den 55 NY2d 604; *Matter of Richardson v Connelie,* 65 AD2d 654), and, where

there is sufficient proof within the whole record to reasonably persuade the fact-finder of the ultimate facts, its determination cannot be disturbed (*300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176, *supra; Matter of Flynn v Flacke,* 87 AD2d 930). We find such evidence in this record. ¶ However, it is petitioner's contention that we need not reach the question of substantial evidence. In this regard, petitioner strenuously argues that the commissioner's water quality standards should not apply to this project. Disposing of this argument presents a troublesome analytical problem. It begins with an examination of the language contained in section 401 of the Federal Water Pollution Control Act (FWPCA) (US Code, tit 33, § 1341, as amd by the Clean Water Act of 1977), which provides that any applicant for a Federal license to construct or operate any facility "which may result in *any discharge* into the navigable waters" must provide the licensing authority with a certificate from the State in which such discharge will originate, stating that such discharge will comply with the State's water quality standards (US Code, tit 33, § 1341, subd [a], par [1]; emphasis added). ¶ "Discharge" is defined in the FWPCA as follows: "The term 'discharge' when used without qualification *includes* a discharge of a pollutant, and a discharge of pollutants" (US Code, tit 33, § 1362, subd [16]; emphasis added). ¶ This broad definition of the word "discharge" and its application to "any discharge" in section 401 of the FWPCA requires that we reject petitioner's fundamental argument, i.e., that for section 401 to apply, a discharge must contain a specific and identifiable pollutant. In rejecting that argument, we further note that such an interpretation advances the FWPCA's purpose of insuring the rights of States to eliminate conditions of pollution (see US Code, tit 33, § 1251, subd [b]), including pollution arising from causes other than specific discharges of identifiable pollutants (see US Code, tit 33, § 1314, subd [f], par [2]). ¶ The next step in our analysis requires that we turn to the particular provisions of the Environmental Conservation Law which provide the Commissioner with the power to apply his water quality standards to the proposed project. In general terms, these standards prohibit the discharge of sewage, industrial waste, or other waste into the waters of the State without a permit (ECL 17-0701, subd 1, par a). ¶ "Industrial waste" is defined as follows: " 'Industrial waste' means *any* liquid, gaseous, solid or waste substance or a combination thereof resulting from *any* process of industry, manufacturing, trade, or business or from the development or recovery of any natural resources, which may cause or might reasonably be expected to cause pollution of the waters of the state" (ECL 17-0701, subd 2, par a; emphasis added). Such broad, encompassing language compels us to find reasonable the Commissioner's conclusion that, in the proposed facility, a transfer of water from the upper reservoir to the lower reservoir is a "discharge" that constitutes industrial waste since it qualifies as "any" liquid resulting from "any" process of industry. The generation of electricity is considered a process of industry (*New England Power Co. v New Hampshire,* 455 US 331, 339, n 6). ¶ Having gone this far, we must go one step further and accept as reasonable the finding that this discharge has the potential of causing pollution, and thus fits the definition of "industrial waste", requiring section 401 certification (ECL 17-0701, subd 2, par a). ¶ "Pollution" is defined as: "the presence in the environment of *conditions* and or contaminants in quantities of [*sic*] characteristics which are or may be injurious to human, plant or animal life" (ECL 1-0303, subd 19; emphasis added). ¶ Since this section speaks in terms of conditions as well as specific contaminants, and temperature changes are certainly a condition of the aquatic environment, it triggers the authority of the Commissioner to adopt and assign standards of quality and purity for water bodies of the State (ECL 17-0301, subd 4). More particularly, the statute provides that these standards: "shall prescribe what

qualities and properties of water shall indicate a polluted condition of the waters of the state which is actually or potentially deleterious, harmful * * * or injurious * * * to * * * aquatic life" (ECL 17-0301, subd 4). ¶ The criteria and standards established by the Commissioner are set forth in his regulations governing thermal discharges and thermal pollution. A thermal discharge is defined as one which results or would result in a temperature change of the receiving water (6 NYCRR 701.1 [*l*]). Obviously, this regulation is addressed to the *effect* that the discharge will have on the receiving waters and does not require that a discharge must be of a heated liquid in order to qualify, as urged by petitioner. Since the Commissioner found that the discharge would cause a temperature change in the receiving waters, the regulations permit it to be labeled "thermal discharge" (6 NYCRR 701.1 [*l*]; see *Matter of Howard v Wyman*, 28 NY2d 434, 438). ¶ Accordingly, the inevitable conclusion is that the proposed project falls within the provisions of the statutes requiring the issuance of a permit from the Commissioner (ECL 17-0701, subd 1, par a). The Commissioner has, concomitantly, rejected petitioner's request for modification of the thermal criteria contained in his regulations, since he was not satisfied with the proof offered by petitioner that the project would assure the protection and propagation of a balanced indigenous population of fish in the Esopus Creek (6 NYCRR 704.2, 704.4). He has been delegated the power to regulate and interpret his own regulations, a power derived from the Legislature. The States have been guaranteed the right to adopt and enforce, within the limits of their authority, any waste pollution control requirement which is as stringent or more stringent than Federal requirements (US Code, tit 33, § 1370). Accordingly, it is the Legislature which has provided the statutory framework allowing the Commissioner to act in the manner evidenced in this proceeding. ¶ We have examined all of the arguments advanced by petitioner. It is our conclusion that under the Commissioner's reasoning and interpretation of his own regulations, the determination must be confirmed. These regulations, within the powers granted to him, are not so vague, subjective or arbitrary that they must be declared invalid. It is not the court's function to substitute its judgment for that of the Commissioner, nor to weigh the evidence before him. Our function is exhausted once we determine a rational basis in the record for the determination under attack. For the reasons stated, we cannot say that the determination is unreasonable or irrational. ¶ Determination confirmed, and petition dismissed, without costs. Kane, J. P., Main, Casey, Weiss and Levine, JJ., concur.