OPINION OF THE COURT
Joseph Harris, J.
Petitioners, by this proceeding pursuant to CPLR article 78, seek judgment declaring null and void a "Notice of Complete Application and Determination of No Significance”, dated April 29, 1989, and a "401 Water Quality Certificate”,[1] both issued by the New York State Department of Environmental Conservation (NYSDEC), for a proposed New York State dam hydroelectric project (State Dam Project), signifying that said project will not contravene State water quality standards.
The instant controversy centers around a proposed hydroelectric project to be located at the site of the existing New York State dam on the Mohawk River between the City of Cohoes and the Town of Waterford. Respondent, ENERCO Corporation, is a New York State corporation and wholly owned subsidiary of respondent Adirondack Hydro Development Corporation, a Delaware corporation engaged in the construction and development of hydroelectric facilities nationwide. (Hereinafter these respondents will be referred to collectively as AHDC.) AHDC is the proponent of the State Dam Project at issue.
Petitioner, Fourth Branch Associates (FBA), is a New York State partnership which operates a hydroelectric facility on the fourth branch of the Mohawk River immediately downstream from the proposed State Dam Project site. FBA’s facility has been in operation since December 1987.
[Factual and procedural background omitted.]
Petitioners contend that NYSDEC’s issuance of a section *336 401 water quality certificate for the State Dam Project was in violation of the procedural mandates of the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 et seq.) and the Uniform Procedures Act, and was arbitrary and capricious. More particularly, petitioners contend that NYSDEC erred in issuing the April 28, 1989 negative declaration in the absence of a properly filed short form (environmental assessment form), and in determining that the State Dam Project would not have a significant impact on the environment, and in dispensing with the filing of an environmental impact statement and the holding of a public hearing.
Respondent, AHDC, contends that Federal law preempts NYSDEC from reviewing AHDC’s application for a 401 water quality certificate under SEQRA; that NYSDEC is limited only to a determination of whether or not water quality standards for the type waterway involved will be met by the project, and is prohibited from engaging in an over-all environmental review under the extensive considerations and requirements of SEQRA; that the latter is the sole prerogative of the Federal Energy Regulatory Commission (FERC), and has already been accomplished by said agency. Consequently, AHDC argues that it could not be required to file an environmental assessment form, which calls for a mass of information related to environmental considerations other than water quality, and that NYSDEC was not required to prepare or cause to be prepared an environmental impact statement or to conduct hearings with respect to AHDC’s application. AHDC contends further that even though, in fact, NYSDEC did conduct a comprehensive environmental review of the State Dam Project under SEQRA, this was superfluous, and the determination by NYSDEC not to require the filing of an environmental impact statement, or to conduct a hearing, was a proper exercise of NYSDEC’s discretion. Lastly, AHDC contends that even if under State law an environmental assessment form is required to be filed, before the issuance of a negative declaration, this is not fatal because Federal preemption precludes the State requirement of an environmental assessment form.
Respondent NYSDEC contends that its determination not to require the preparation of an environmental impact statement, and to dispense with public hearings, was a rational and lawful exercise of its discretion, but moves to remand the proceeding, for further review, based upon its contention that it erred procedurally in issuing a negative declaration in the absence of an environmental assessment form. NYSDEC fur *337 ther contends that the Federal Power Act (16 USC § 791a et seq.) does not preempt SEQRA review of a 401 water quality certificate, limiting it merely to a determination of compliance with State water quality standards previously promulgated by the State of New York and approved by the Federal Government, and argues that in light of its request for remand for the purpose of requiring AHDC to furnish an environmental assessment form, the issue of preemption is not “ripe for review” by this court.
Contrary to NYSDEC’s contention respecting ripeness, it is apparent that a resolution of the preemption question would be dispositive of the procedural and substantive errors claimed by both petitioners and NYSDEC. Once again, petitioners claim NYSDEC erred in issuing a negative declaration in the absence of an environmental assessment form (see, 6 NYCRR 617.2 [y]; 617.5, 617.6 [h] [1] [i]), in failing to require the preparation of an environmental impact statement (see, ECL 8-0109 [2]; 6 NYCRR 617.6 [g] [1] [ii]; 617.8, 617.11), and in dispensing with a public hearing (see, 6 NYCRR 617.8 [d]). NYSDEC moves for remand due to AHDC’s failure to file an environmental assessment form prior to the issuance of the negative declaration. In the event that by reason of the preemption issue this court determines SEQRA inapplicable to NYSDEC’s review of an application for a 401 water quality certificate, these objections, insofar as they implicate the procedural and substantive nuances of SEQRA, will be resolved in favor of AHDC. Consequently, an initial resolution of the preemption issue is paramount, and may serve effectively to cut the Gordian knot herein.
The congressional intent to appropriate to the Federal Government exclusive control over the development and regulation of the hydroelectric power resources of our Nation’s navigable waterways is apparent in light of the circumstances which led to the passage of the Federal Power Act[2] in 1920.
Historically, the Federal Power Act “was the outgrowth of a widely supported effort [on the part of] the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, in so far as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted.” (First Iowa Coop. *338 v Power Commn., 328 US 152, 180.) In furtherance of this objective, Congress, pursuant to the authority vested in the Federal Government by the Commerce Clause of the US Constitution, enacted the Federal Power Act of 1920.
In so doing, " 'Congress * * * vested the Federal Power Commission with broad responsibility for the development of national policies in the area of electric power, granting it sweeping powers and a specific planning responsibility with respect to the regulation and licensing of hydroelectric facilities affecting the navigable waters of the United States.’ ” (Matter of Power Auth. v Williams, 60 NY2d 315, 325; Matter of de Rham v Diamond, 32 NY2d 34, 44.) Since its inception it has been consistently held that the Federal Power Commission,[3] through enactment of the Federal Power Act, has been vested with "practically exclusive jurisdiction over the regulation and licensing of hydroelectric” projects on the navigable waterways of this country which preempts all licensing and permit functions with respect to projects within the Commission’s jurisdiction. (Power Auth. v New York State Dept. of Envtl. Conservation, 379 F Supp 243, 249; Matter of de Rham v Diamond, 32 NY2d 34, 44, supra; Matter of Power Auth. v Williams, 60 NY2d 315, 325, supra; California ex rel. State Water Resources Bd. v Federal Energy Regulatory Commn., 877 F2d 743 [9th Cir, June 6, 1989].) Absent express modification of this exclusive jurisdiction over licensure of hydroelectric projects by Federal legislation, the jurisdiction of the Federal Power Commission is predominant in this area. (Federal Power Commn. v Oregon, 349 US 435; Power Auth. v New York State Dept. of Envtl. Conservation, 379 F Supp 243, supra.)
In the instant proceeding, both petitioners and NYSDEC contend that Congress, by the enactment of section 21 (b) of the Federal Water Pollution Control Act of 1970 (then 33 USC § 1171 [b]), now superseded, but without substantial change, by the 1972 amendments to the Federal Water Pollution Control Act (see, 33 USC § 1341), contained in the Federal Clean Water Act, modified the Federal Government’s exclusive jurisdiction over licensure of hydroelectric projects to the extent that NYSDEC, in reviewing a 401 water quality certificate application, must conduct a full SEQRA environmental review. This view contravenes the express holdings of the Court of Appeals in both de Rham (supra) and Power Auth. v *339 Williams (supra), and engenders an unwarranted and unauthorized duplication of regulatory control and an incursion by NYSDEC into an area entrusted exclusively to FERC, as evidenced by the pervasive regulatory scheme established by the enactment of the Federal Power Act and related Federal statutes.
Section 401 of the Federal Clean Water Act, amending the Federal Water Pollution Control Act, requires that any applicant for a Federal license or permit which may result in any discharge into navigable waters must provide FERC with a certificate from the originating State that such discharge complies with various enunciated sections of the Act unless the certification requirements are waived by the State. The States must establish procedures for public notice of all applications for certificates, and they may also, to the extent they deem appropriate, hold public hearings with respect to specific applications. Section 401 (d), upon which petitioners and NYS-DEC place great reliance as a broad grant of authority to the States to conduct an exhaustive environmental review of projects subject to the section 401 certification requirement, merely necessitates that the certificate of the State set forth effluent and other limitations, and monitoring requirements, so as to ensure that the applicant will comply with various sections of the Federal Water Pollution Control Act of 1970, and with any other appropriate requirements of State law set forth in such certification. (33 USC § 1341 [d].)[4]
33 USC § 1341 (a) provides, in pertinent part, that: "(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over *340 the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of this Act [33 USCS §§ 1311, 1312, 1313, 1316, 1317]. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 301 (b) and 302 [33 USCS §§ 1311 (b), 1312], and there is not an applicable standard under sections 306 and 307 [33 USCS §§ 1316,1317], the State shall so certify, except that any such certification shall not be deemed to satisfy section 511 (c) of this Act [33 USCS § 1371 (c)]. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.”
In this regard, both NYSDEC and petitioners urge that the language "any other appropriate requirement of State law set forth in such certification”, contained in section 401 (d) of the Federal Clean Water Act, amending the Federal Water Pollution Control Act (33 USC § 1341 [d]), expressly grants New York State the authority to subject section 401 certificate applications to full SEQRA environmental review. This position is untenable, and in conflict with prior rulings of the New York Court of Appeals.
It is apparent, when viewed in the context of both section 401 and the entire Federal Water Pollution Control Act, that this language only refers to the authority of a State to establish water quality standards "more restrictive * * * than those imposed by the Act.” (Power Auth. v New York State Dept. of Envtl. Conservation, 379 F Supp 243, 249, supra.)
Those cases which have interpreted the scope and breadth *341 of the Federal Power Commission’s authority that was divested to the States by section 401 of the Federal Clean Water Act have construed the divestiture narrowly and have consistently held that NYSDEC’s authority extends only to consideration of the proposed project’s impact on the applicable water quality standards implemented by the State, in conformity with the Act.
In Matter of Power Auth. v Williams (60 NY2d 315, supra), the Power Authority of the State of New York (PASNY) had applied to the New York State Department of Environmental Conservation for a section 401 water quality certification respecting a proposed hydroelectric generating project on the Hudson River. The Commissioner of Environmental Conservation denied PASNY’s application on the ground that it had failed to demonstrate that relevant water quality standards would be met. In a CPLR article 78 proceeding brought by PASNY, the Appellate Division, Third Department (Matter of Power Auth. v Flacke, 94 AD2d 69), annulled the Commissioner’s determination, holding that in denying section 401 certification the Commissioner had not undertaken a balancing of the need for the project — to meet State energy requirements— against its environmental impact.
The Court of Appeals reversed (Matter of Power Auth. v Williams, 60 NY2d 315, supra), holding that NYSDEC, on an application for State section 401 certification of a hydroelectric project as a prerequisite for the issuance of a Federal license, is limited to determining whether applicable water quality standards will be met, and is not empowered to base its decision on a balancing of need for the project against adverse environmental impact.
In reversing the Appellate Division, the Court of Appeals (supra, at 325, quoting from its prior decision in Matter of de Rham v Diamond, supra, at 44), explained that " ’Section 21 (subd. [b]) of the Federal Water Pollution Control Act relinquishes only one element of the otherwise exclusive jurisdiction granted the [Federal] Power Commission by the Federal Power Act. It authorizes States to determine and certify only the narrow question whether there is "reasonable assurance” that the construction and operation of a proposed project "will not violate applicable water quality standards” of the State. That is all that section 21 (subd. [b]) did, and all that it was designed to do. Congress did not empower the States to reconsider matters, unrelated to their water quality standards, *342 which the [Federal] Power Commission has within its exclusive jurisdiction under the Federal Power Act.’ ”
Again quoting from de Rham (supra, at 44-45), the court further stated: " 'With this in mind, it is clear that the State Commissioner was required only to consider water quality standards which may be affected by discharges from Con Ed’s project into the Hudson River — in other words, to ascertain whether the project would offend against the applicable regulations (6 NYCRR 701.3) [governing the class of waterway at the location of the proposed site] * * *. It is equally clear that the Commissioner has neither the authority nor the duty to delve into the many other issues — which had been investigated and decided by the Federal Power Commission in the course of the extensive proceedings it had conducted.’ ” (Supra, at 325 [emphasis added].)
Applying this rationale to the case before it, the Williams court made it clear that "[t]he [401] certification referred to in the Federal Clean Water Act * * * is simply of compliance with section 303 of the Federal statutes (US Code, tit 33, § 1313), which provides for either State-adopted, Federally approved water quality standards or the promulgation of standards by the Federal Environmental Protection Agency.” (Supra, at 326.)
As it relates to review of a section 401 water quality certification, the process involves standards adopted by NYS-DEC which have been Federally approved. These standards "establish use classifications of waters within the State with specific, individual standards, relating to such things as turbidity and temperature change, assigned to the various classifications (e.g., 6 NYCRR 701.4, 704.2 [b]).” (Matter of Power Auth. v Williams, supra, at 326.)
"The section 401 certification process is accomplished by a determination that a proposed project will meet the particular water quality standards for the applicable classification.” (Supra, at 326-327.)
Finally, the Court of Appeals in Williams (supra, at 327) made it clear that the Commissioner, in reviewing a section 401 water quality application, has "neither the authority nor responsibility to engage in balancing economic, energy, environmental or other factors or to reflect public interest other than as it is set forth in the State water quality standards.”
In Matter of de Rham v Diamond (32 NY2d 34, supra), the Court of Appeals, in affirming the Commissioner’s grant of a *343 water quality certificate, expressly rejected petitioner’s contentions that the Commissioner of Environmental Conservation erred in failing to consider certain non-water-quality environmental impacts, such as the safety of the Catskill Aqueduct, the appearance of the Hudson River shoreline, or the protection of the river’s fish life, apart from the effect that destruction of, or injury to, fish may have, by introduction of waste or pollutants, on the water quality standards required by the applicable regulations, all of which had been extensively investigated and resolved by the Federal Power Commission (as it was likewise by the Federal Energy Regulatory Commission in the instant case).
SEQRA, by its very nature, entails a broad scope environmental review of any "action” which "may have a significant impact on the environment.” (See, ECL 8-0109 [2].) This is evident from the definition SEQRA imparts to the term "environment”, which "means the physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character.” (ECL 8-0105 [6]; 6 NYCRR 617.2 [k] [1].) Moreover, the Court of Appeals has consistently interpreted SEQRA’s definition of "environment” liberally so as to facilitate implementation of the explicit legislative purpose "to * * * encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and enhance community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state.” (ECL 8-0101; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 365.)
In Chinese Staff & Workers (supra, at 367), the Court of Appeals, in confirming the expansive reach of SEQRA review, annulled the New York City Board of Estimate’s issuance of a special permit for a high-rise condominium project due to the lead agencies’ failure to consider the project’s impact on the potential acceleration of the displacement of local residents and businesses as a secondary long-term effect on population patterns, community goals and neighborhood character.
Not only does SEQRA define environmental concerns within its scope broadly, but the courts of this State have made it conspicuous, where SEQRA applies, that the failure to consider all relevant environmental concerns implicated by *344 SEQRA constitutes an abuse of administrative discretion. (H.O.M.E.S. v Urban Dev. Corp., 69 AD2d 222; Chinese Staff & Workers Assn. v City of New York, supra.)
It is, however, obvious that the imposition of SEQRA’s mandatory broad scope environmental review upon an application for section 401 water quality certification is antithetical to the Court of Appeals narrow interpretation of NYSDEC’s limited authority to review water quality related issues. Indeed, it is clear that NYSDEC is preempted from reviewing AHDC’s section 401 water quality application under SEQRA.
In preempting the field of hydroelectric development by the enactment of the Federal Power Act, Congress evidenced its intent to eliminate a dual system of duplication between two authorities over the same subject matter. The imposition of SEQRA review would clearly violate the implicit prohibition of dual control inherent in the Federal Government’s preemption of the field.
All parties to the instant controversy concede that the Federal Energy Regulatory Commission, as part of its licensing process, is mandated by law to conduct a broad scope environmental review of the State Dam Project.
In this regard the Federal Power Act specifically requires that any license issued under the Act shall provide for "adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial uses” (16 USC § 803 [a] [1]). Moreover the Federal Electric Consumer Protection Act of 1986 requires that FERC, in deciding whether to issue any license under the Federal Power Act, for any project, must, in addition to considering the power and development purposes for which licenses are issued, "give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.” (16 USC § 797 [e].) Finally, the National Environmental Policy Act of 1969 (42 USC § 4321 et seq.) also requires FERC to consider the broad scope environmental impacts of a project prior to issuance of a license for the same. (See, 42 USC §§ 4321, 4332 and 4333.)[5] In Udall v FPC (387 US *345 428, 450), the United States Supreme Court, in interpreting the Federal Power Act, made it clear that in reviewing a license application, the Federal Power Commission may only make a determination “after an exploration of all issues relevant to the 'public interest,’ including future power demand and supply, alternate sources of power, the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wildlife.”
Indeed, in the instant case, FERC, in accord with its legislative mandate, thoroughly reviewed the environmental impact of the State Dam Project, including all of the issues raised by petitioners, and concluded that the project would not have an adverse environmental impact. Moreover, FERC, in issuing its amended license on July 7, 1989, implicitly rejected all of the environmental objections which petitioners now raise in the instant proceeding.[6]
Among other things, FERC determined that petitioner FBA’s objections that the project would impair the historic downstream flow distribution of the Mohawk River was merit-less, stating: "While Fourth Branch may not be ready to accept downstream flow distribution data that has been assembled by ENERCO, it has failed to provide any credible evidence that the information provided is inaccurate or incomplete.” It is to be noted that in California v Federal Energy Regulatory Commn. (877 F2d 743, 744 [9th Cir, June 6, 1989], supra), the court held that the Federal Power Act awards the Federal Government “sole authority to set flow rates.”
With respect to FBA’s concerns over the impact of the project on downstream migration of blueback herring and fish habitat, FERC concluded that the "mitigative recommendations of ENERCO, the agencies, and staff would ensure that the over-all environmental impact of the project construction and operation” on fish populations in the river “would be insignificant.” In this regard, it is to be noted, as stated before, that the Court of Appeals, in de Rham (supra, at 45), expressly stated that the “Commissioner has neither the author *346 ity nor the duty to delve into the * * * issue * * * [of] the protection of the River’s fish life [in reviewing a water quality application] * * * apart from the effect that destruction of, or injury to, fish may have, by [way of] introduction of waste or pollutants, on the water quality standards required by the applicable regulations.”
With respect to FBA’s concern over increased sedimentation during the construction and operation of the State Dam Project, FERC, in article 401 of the order amending license, expressly approved ENERCO’s soil erosion and sediment control plan. FERC also considered FBA’s concern over the impact of the project on the upstream floodplain as well as the over-all impact of the project on the environment and concluded that the project would have "no significant impact on the environment.”
Petitioners seek to raise, and NYSDEC claims authority to review, the identical issues which have already been addressed and resolved by FERC in issuing its license for the State Dam Project herein. While the reconsideration of these factors, visá-vis NYSDEC’s review of AHDC’s 401 water quality certification, appears to be expressly authorized by SEQRA,[7] UPA[8] and the New York State Energy Law,[9] it is well settled that the Federal Government’s preemption of this area cannot be overcome by the enactment of State law. (Matter of Power Auth. v Williams, 60 NY2d 315, 326, supra) Moreover, there can be no doubt that the State cannot impose SEQRA review upon a section 401 water quality certification, for to do so would allow the State of New York to duplicate and possibly contravene the final decision-making authority of the Federal Government with respect to these projects, when exclusive authority has been entrusted to FERC by the Federal Power Act. (First Iowa Coop. v Power Commn., 328 US, supra, at 167-168.) Where, as here, the Federal Government has completely occupied a particular field, a State law, like SEQRA, regulating the same subject matter, can only be deemed inconsistent with the Federal Government’s transcendent interest, whether or not SEQRA by its terms actually conflicts with the Federal statute. (See, Albany Area Bldrs. Assn. v Town of Guilderland, 74 NY2d 372 [Oct. 26, 1989].) Were SEQRA permitted to operate in the field exclusively entrusted to the Federal En *347 ergy Regulatory Commission by the Federal Power Act, it would clearly tend to inhibit the operation of the Federal Power Act and would thereby thwart the operation of the Federal Government’s overriding policy concerns regarding the comprehensive development of national hydropower resources. Clearly there can be no suggestion that the State, by attempting to prescribe SEQRA review of the instant section 401 water quality certificate, is entitled to review the identical environmental concerns which have been entrusted exclusively by Congress to FERC. (First Iowa Coop. v Federal Power Commn., 328 US 152, supra; Federal Power Commn. v Oregon, 349 US 435, supra.)
Thus it is clear that the Federal Power Act preempts NYSDEC from conducting a full SEQRA review of AHDC’s section 401 water quality certification. The Commissioner is entitled only to review AHDC’s application to the extent necessary to ascertain whether or not the State Dam Project would offend against the applicable regulations (6 NYCRR part 701) governing "Class 'C’ ” waters, the classification of the Mohawk River at the State dam site. (6 NYCRR 876.4.)[10]
Having determined SEQRA to be inapplicable to NYSDEC’s *348 determination of AHDC’s section 401 water quality application, it follows that the Commissioner has no authority to require either the filing of an environmental assessment form, or the preparation of an environmental impact statement,[11] or to direct a public hearing pursuant to SEQRA.
[The court further held that the administrative procedures required by the Uniform Procedures Act (ECL 70-0101 et seq.) were complied with. Discussion omitted.]

. Section 401 of the Federal Clean Water Act (33 USC § 1341) provides, inter alla, that before a Federal agency, such as the Federal Energy Regulatory Commission may issue a permit or license for a project that may adversely impact water quality, the State in which the project is proposed must first certify that the project will not contravene State water quality standards.

. 41 US Stat 1063, as amended by 49 US Stat 838; 16 USC §§ 791a-825r.

. Now the Federal Energy Regulatory Commission.

. 33 USC § 1341 (d) provides that: "Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 301 or 302 of this Act [33 USCS § 1311 or 1312], standard of performance under section 306 of this Act [33 USCS § 1316], or prohibition, effluent standard, or pretreatment standard under section 307 of this Act [33 USCS § 1317], and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section. ” (Emphasis added.)

. SEQRA, to a great extent, was modeled upon the Federal National Environmental Protection Act. (See, Weinberg, Practice Commentary, McKinney’s Cons Laws of NY, Book 17 Yz, ECL 8-0101, at 60; op. cit., ECL 8- *345 0105, at 66; op. cit, ECL 8-0107, at 67.) This further supports this court’s conclusion that SEQRA review of a section 401 water quality certification would necessarily implicate an unauthorized duplication of authority entrusted exclusively to FERC.

. In this regard, petitioner FBA was an intervenor in the proceedings relative to the amended license before FERC, and FERC specifically found these objections to be without merit.

. ECL 8-0101 et seq.

. ECL 70-0101 et seq.

. Energy Law § 21-106.

. Preemption is a necessary concomitant of a Federal system. It applies as well to Federal-State relationships as it does between States and their municipalities. (See, Albany Area Bldrs. Assn. v Town of Guilderland, 74 NY2d 372.) Different concerns, if any, must be reconciled by giving way to the higher governmental unit or by appealing to the legislative branch of the higher governmental unit to release the desired authority. In the instant case, however, there is no real conflict between the concerns of the Federal Government and the State of New York.
"It does not follow, however, from the inability of the commissioner to consider more than compliance with water quality standards in acting on an application for section 401 certification that all other factors are necessarily disregarded or beyond reach at the State level. To the contrary, public interests of broad scope are implicated both in the classification of State waters, which is required to be done 'in accordance with considerations of best usage in the interest of the public’ (ECL 17-0301, subd 2), and in the fixing of standards of purity within classifications, which are to be established consistent with a variety of interests — 'public health and public enjoyment thereof, the propagation and protection of fish and wild life, including birds, mammals and other terrestrial and aquatic life, and the industrial development of the state’ (ECL 17-0101). Indeed, under section 303 (subd [c], par [2]) of the FWPCA the use and value of State waters for industrial purposes is one of the factors which must be taken into consideration in the adoption of State water quality standards if they are to receive Federal approval (US Code, tit 33, § 1313, subd [c], par [2]).” (Matter of Power Auth. v Williams, 60 NY2d 315, 327, n 3.)
Moreover, NYSDEC clearly has the right to intervene before FERC and can present and develop those matters reserved for Federal appraisal and
*348 determination, should it be so desired. (Power Auth. v Department of Envtl. Conservation, 379 F Supp 243.)

. Broad scope environmental review having been reserved exclusively to FERC, NYSDEC has no authority to require AHDC to furnish information concerning the effect of the proposed project on anything other than water quality. (Long Lake Energy Corp. v Department of Envtl. Conservation, Sup Ct, Ulster County, June 27,1989, Bradley, J.)