Chief Judge Fuld.
The State Commissioner of Environmental Conservation, acting pursuant to section 21 (suhd. [b]) of the Federal Water Pollution Control Act, determined that there is “ reasonable assurance ” that construction and operation of Consolidated Edison’s Cornwall Project will not violate or contravene water quality standards applicable to the waters of the Hudson River. On this appeal, the scope of judicial review being limited, we are called upon, not to weigh the facts or merits of this long-drawn-out -controversy de novo, hut simply to decide whether the Commissioner acted in accordance with the law and had a reasonable basis for his determination.
In 1963, Consolidated Edison (hereafter referred to as Con Edison or Con Ed) applied to the Federal Power Commission, as required by the Federal Power Act (U. S. Code, tit. 16, § 792 et seq.), for a license to construct and operate a pumped storage hydroelectric facility on the western shore of the Hudson River, at Storm King Mountain, in Cornwall, New York, about 40 miles north of New York City.[1] The Commission initially granted a license in 1965 hut, following court review, the licensing order was set aside by the United States Court of Appeals for the Second Circuit and the case was remanded to the agency for further proceedings. (See Scenic Hudson Preservation Conference v. Federal Power Comm., 354 F. 2d 608, cert. den. 384 U. S. 941.) Following the proceedings on remand—which involved 100 hearing days, the testimony of some 60 expert witnesses and filled *41 a record of more than 19,000 pages — the Commission again granted Con Ed a license on August 19, 1970.[2]
The contemplated project, if and when constructed, will be the largest pumped storage plant in the world. It will consist of an upper storage reservoir and a tunnel between that reservoir and a powerhouse and transmission facilities. Water will be pumped from the Hudson River at night and on weekends to the reservoir—which would be situated some 10,000 feet south and west of the powerhouse in a natural mountain basin behind Storm King Mountain—and then be discharged, as electricity is needed during the day, through a number of reversible pump-turbine generators, having a capacity of 2,000 megawatts (2,00Q,000 kilowatts), back to the Hudson River. The principal function of the facility will be to supply electricity to the metropolitan New York region and to interconnected utility systems — denominated the New York Power Pool — during periods of peak demand and during periods of emergency.
Since the project is completely dependent on off-peak power supplied from other plants located in other areas, no coal, oil, gas or other fuel will be burned at the Cornwall site. Falling water provides the only energy source for the project’s generation of electricity.[3]
In March, 1971, about- six months after the Federal Power Commission had granted the utility a license, Con Ed applied to the New York State Department of Environmental Conservation for a “ certificate of reasonable assurance ” that appli *42 cable New York State water quality standards wotild not be vio-íated by its proposed project. This application was made pursuant to section 21 (stibd. [b]) of the Federal Water Pollution Control Act (U. S. Code, tit. 33, § 1171, subd. [b]); it provides, in part, as follows:
u Any applicant for a Federal license ■ * * * to conduct any activity, including * * * the construe^ tion or operation of facilities, which may result in, any discharge into the navigable waters of the United States, shall provide the licensing *. * * agency [the Federal Power Commission in this case] a certification jfrom the State in which the discharge originates or will originate * * * that there is reasonable assurance, as determined by the State * * * that such activity will be conducted in a manner which will not violate applicable water quality standards.”
The Department of Environmental Conservation gave public notice of the application and thereafter public hearings were held in which extensive testimony was taken. At the conclusion of the hearings, and by letter dated August 17, 1971, the Commissioner of Environmental Conservation, Henry L. Diamond, issued the requested certification of “ reasonable assurance ’ ’ that the State’s water standards ‘ ‘ will not be contravened ” by the construction and operation of the facility at Cornwall.[4] In addition, the Commissioner attached to his certification four conditions “ [i]n order * * * to insure-”, as he put it, ‘ ‘ that the operation of this fability in the future will not contravene the [State’s] adopted water standards".[5]
*43 The petitioners — conservation groups, individuals, the Town of Poughkeepsie and the City of New York, who have been actively opposed to the Cornwall Project for many years — thereafter instituted this article 78 proceeding to review the Commissioner’s determination. In essence, they asserted, in a petition consisting of eight “ claims,” not only that the Commissioner acted arbitrarily and capriciously in certifying that there is reasonable assurance that the project would not violate applicable water quality standards but also that he failed to consider several relevant matters in making his determination.
Following the filing of answers by the Commissioner and Cop Edison, the court at Special Term annulled the certification. It was its view that the Commissioner had acted ‘ ‘ in excess of his jurisdiction and in violation of law.” (69 Misc 2d 1, 4.) On appeal, the Appellate Division unanimously confirmed the Commissioner’s determination and dismissed the petition in its entirety (39 A D 2d 302).[6] It was its conclusion that the Commissioner gave ‘ ‘ due consideration * * * to all factors which would directly affect all aspects of water quality in the immediate vicinity of the project and indirectly affect water quality at other places on the Hudson River and in the State of New York ” and that there was “ a reasonable basis ” for issuance of the certificate (p. 305).
We gain a clearer perspective of this case and a better understanding of the arguments urged upon us if we realize the very *44 limited authority granted the ¡átate Commissioner by section 21 (subd. [b]). (See., e.g., Calvert Cliffs’ Coordinating Comm. v. United States Atomic Energy Comm., 449 F. 2d 1109, 1123.)
Congress, by the Federal Power Act (U. S. Code, tit. 16, § 792 et seq.), has vested the Federal Power Commission with broad responsibility for the development of national policies in the area of electric power, granting it sweeping power’s and a specific, planning responsibility with respect to the regulation and'licensing of hydroelectric facilities affecting the navigáble waters of the United States.[7] The Commission’s jurisdiction with respect to such projects pre-empts all State licensing and permit functions. (See First Iowa Coop. v. Power Comm., 328 U. S. 152; see, also, Federal Power Comm. v. Oregon, 349 U. S. 435; City of Tacoma v. Taxpayers, 357 U. S. 320.)
Section 21 (subd. [b]) of the Federal Water; Pollution Control Ant relinquishes only one element of the otherwise exclusive' jurisdiction granted the Power Commission by the Federal Power Act. It authorizes States to determine and certify only the narrow question whether there is “ reasonable assurance ” that the construction and operation of a proposed project “ will not violate applicable water quality standards ” of the State. That is all that section 21 (subd. [b]) did, and all that it was designed to do. Congress did not empower the States to reconsider matters, unrelated to their water quality standards, which the Power Commission has within its exclusive jurisdiction under the Federal Power Act.
With this in mind, it is clear that the State Commissioner was required only to consider water quality standards which may be *45 affected by discharges from Con Ed’s project into the Hudson River — in other words, to ascertain whether the project would offend against the applicable regulations (6 NYCRR 701.3) governing “ Class B ” waters, the classification of the River at Cornwall (6 NYCRR 858.4). It is equally clear that the Commissioner has neither the authority nor the duty to delve into the many other issues—which had been investigated and decided by the Federal Power Commission in the course of the.extensive proceedings it had conducted—such as, for instance, (1) the safety of the Catskill Aqueduct, (2) the appearance of the Hudson River shoreline or (3) the protection of the River’s fish life, apart from the effect that destruction of, or injury to, fish may have, by introduction of waste or pollutants, on the water quality standards required by the applicable regulations. We would, however, note that it is apparent from the record before the Commissioner in this proceeding that there is, as found by the Federal Power Commission and affirmed by the Federal Court of Appeals, reasonable assurance that construction of the project would not, in fact, result in any damage to the Aqueduct (453 F. 2d, at pp. 478-480) or adversely affect, in any significant way, the River’s fish resources (453 F. 2d, at pp. 476-478).
It is our judgment, as it was the Appellate Division’s (39 A D 2d 302), that the Commissioner gave due consideration to every factor which had a bearing on the applicable water quality standards and that his determination, made in his administrative capacity, far from being arbitrary or capricious, was rational and reasonable (CPLR 7803, subd. 3; see, e.g., Matter of Older v. Board of Educ., 27 N Y 2d 333, 337; Matter of 125 Bar Corp. v. State Liq. Auth., 24 N Y 2d 174, 178).
In our court, the petitioners repeat their contentions that the Commissioner acted in an arbitrary and capricious manner, first, in purporting to find “ reasonable assurance ” that there would be neither thermal pollution, salt intrusion nor danger to the Hudson River’s fish life and, second, in failing to consider the danger which the. project would pose to the Catskill Aqueduct and to the fisheries resources. As already indicated, we find no substance to any of these arguments.
The Hudson River at Cornwall has been classified, pursuant to the Public Health Law (§§ 1205, 1210 [now ECL, §§ 17-0301, 17-0303]), as “ Class B ” (6 NYCRR 858.4). The applicable regula *46 tions governing such Class B waters (6 NYCRR 701.3) provide that the requisite standard is not satisfied (3) if “Floating solids; settleable solids; [or] sludge deposits ” are visible and attributable to sewage or industrial or other wastes; (2) if “ Sewage or waste effluents ” are not effectively disinfected; (3) if the “pH” level—-i.e., level of acidity-alkalinity -—is less than 6.5 or more than 8.5; (4) if the “ Dissolved oxygen ” content of the waters affected—which are nontrout wateis^is less than 4.0 parts per million; or (5) if “ Toxic wastes,.oil, deleterious substances,” etc., in amounts or at temperatures to be injurious to fish life, make the waters unsafe or unsuitable for bathing or impair the waters for any other best usage.
Since the petitioners do not contest the Commissioner’s findings with respect to item 2 (sewage or wa'ste effluents), items 3 and 4 (pH and dissolved oxygen levels) or item 5 (toxic'Wastes, oil, etc.), we shall discuss only item 1 (floating solids, etc.).
The hearing examiner expressly concluded that there is .reasonable assurance that neither the construction nor the operation of the project “ would cause dischaige of floating solids, settleable solids, or sludge deposits to the Hudson Biver in a manner which would violate the applicable water quality standards ’ ’, and the record fully supports that conclusion. The project will simply cause the Hudson Biver water which is pumped into its storage reservoir to be discharged, unchanged and unadulterated, back into the Biver; in other words, only those solids present in the Biver water which is pumped into the reservoir will be discharged unchanged back into the Biver. Construction of the project, it is true, will involve a certain amount of dredging and will require the deposit of rock excavated from the project powerhouse and tunnels to be made along the waterfront near the Village of Cornwall. Such dredging and deposit of rock will involve the addition of a certain amount of temporary turbidity to the Biver water in the immediate vicinity of construction but none of this turbidity would be attributa • ble to sewage, industrial waste or other waste and, after a reasonable opportunity for mixing, these particles would not be readily visible, if at all present.
The record also establishes, contrary to the claim of the several petitioners, that the Commissioner was justified in certifying that there is reasonable assurance that the project will *47 neither adversely affect the River’s fish life nor cause salt water intrusion or thermal pollution.

Effect on Fish Life

Finding as a fact that ‘ ‘ there is not likely to be any significant adverse effect to fish of the River from a pumped generating plant at Cornwall,” the hearing examiner concluded that there is “ reasonable assurance ” that construction and operation of the project “ will not have a significant adverse effect upon fish life in the Hudson.”
The record before us sustains that conclusion. In the first place, the plans for the project include protective screens designed to'protect small fish from entering the facility’s intake. In the second place, the subject of Hudson River fishery was extensively considered by the Federal Power Commission. At the hearing before that body, fishery biologists, experts in the design and operation of screening devices and others testified. One witness (Dr. Alfred Perlmutter of New York University) declared that the project “will have no measurable effect on the Hudson River fishery ” and a staff member of the Commission itself stated that fish losses caused by the project’s operation “ would not significantly affect the Hudson River fishery resources.” And, in the third place, the Hudson fever Policy Committee — consisting of top-flight experts of the New York State Conservation Department, the New Jersey Division of Fish and Game, the United States Bureau of Commercial Fisheries and the United States Bureau of Sports Fisheries and Wildlife — following a three-year study (1965-1968) of the effect of the project on aquatic life, reported that ‘[1] there would not be any significant adverse effects to the striped bass and American shad fisheries of the Hudson River from a pumped storage generating plant in Cornwall ”.
It is noteworthy that the Federal Power Commission reached ,the same conclusion after a careful investigation of the entire project. Beyond that, under the terms of the Federal Power Commission license, Con Ed is required to conduct further studies relating to the entire subject and, indeed, the license is conditioned upon the utility’s installing fish protective facilities and making any modifications that may be ordered by the Commission.
*48 In short, as already stated, there is ample evidence in the record that danger to fish life will be minimal and that the Commissioner was justified in determining that there is reasonable assurance that water quality standards would not be affected in this regard.

Salt Water Intrusion

The court at Special Term stated that the examiner’s report “noted * * * a complete absence of studies concerning salt' water contamination” (69 Misc 2d, at p. 3). This, however, ignores the hearing examiner’s finding that “ [u]ncontroverted expert opinion supports the anticipation that salt intrusion will be minimal and inconsequential ”. In fact, although there was conflicting testimony, one witness, a sanitary and environmental engineer (Dr. Lawler), testified that, having made an “ extensive study of the natural behavior of salt in the [Hudson River] estuary ”, it was his opinion that there was no basis for the petitioners’ suggestion that the project’s operation would cause upstream movement of salt water in the Hudson.
Actually, the evidence adduced shows that the salinity of the Hudson River varies greatly from season to season under natural conditions. Thus, an aquatic biologist (Dr. Lauer) testified that the so-called “ salt line ” may be' as far south as the Tappan Zee Bridge in the springtime when the fresh water flow is greatest and as far north as Newburgh during the drier periods of the year. And the sanitary and environmental engineer (Dr. Lawler) also stated that significant upstream movement of salt wafer as a result of the project operation could not occur because any disturbance of the river occasioned by the Cornwall Project would not possess the magnitude, duration and oscillatory effect necessary to have any impact on those factors which control such salt water movement from the ocean.
Although the Commissioner found that there was reasonable assurance that the project would not result in salt wafer intrusion, he, nevertheless, took note of the petitioner’s apprehensions and insured against even the remote possibility of such intrusion by attaching conditions “ B ” and “ D ” to his certification (see, supra, p. 42, n. 5). Those conditions require termination of the project operation and initiation of any changes in the *49 operation necessary to halt and reverse any significant salt water contamination.

Possible Thermal Pollution

Since the project is a pumped-storage facility rather than a conventional type of fuel-burning plant, the project, the record makes clear, will cause no heated liquids or cooling water to be discharged into the River. Theoretically, we are told, operation of the project could cause a negligible heating of the water pumped up and released through the tunnel by reason of friction and, possibly, by exposure to sunshine during storage in the reservoir. However, such a theoretical amount of temperature increase is, as the hearing examiner found, inconsequential.
It follows, therefore, that the Commissioner was warranted in deciding that there is reasonable assurance that the project would not cause thermal pollution of the waters of the Hudson or violate applicable standards at Cornwall. In point of fact, the petitioners do not contest this. They do, however, contend that heated waters would be discharged at other power generating stations, along the Hudson and elsewhere, which might be utilized to produce energy to pump the Cornwall facility and that, absent affirmative supporting evidence, the Commissioner was not justified in concluding that there was reasonable assurance that there would be no unlawful thermal discharges, no violation of water quality standards at those other locations.
We find the argument without substance. Indeed, we agree with the respondents that, in advancing it, the petitioners overlook the fact that every existing and future steam-electric generating station, wherever located, must at all times comply with the water quality standards applicable to the waterway from which its cooling water is withdrawn (6 NYCRR Parts 701-704). There must be compliance with those standards regardless of whether the electricity from any power station is used to pump a particular facility, illuminate city streets or serve some other purpose. As far as the thermal effects on the receiving water adjacent to any such plant are concerned, the ultimate utilization of the power produced by any particular steam-electric plant is irrelevant. The thermal limits of receiving waters should be and are set in accordance with the physical and biological requirements of each receiving waterway (ECL, § 17-0301); they are *50 not related to the place where generated electricity is transmitted and utilized.
Also significant is the fact that the Conservation Department must review, indeed is presently reviewing, the operation of all steam-electric plants, existing and under. construction in Mew York State, in order to determine whether there is reasonable assurance that, as independent plants, they wih not violate applicable water quality standards. Such review, totally separate from the project, arises from the recent and separate Federal requirement that all steam-electric plants obtain ‘ ‘ discharge permits” and from the fact that such permits are independently subject to the requirements of section 21 (subd, [b]) (Exec. Order No. 11574; see U. S. Code, tit. 33, § 407; Federal Water Pollution Control Act Amendments of 1972 [86 U. S. Stat. 816, 880], § 402). In connection with its application for these discharge permits, the record discloses that Con Ed has applied to the Commissioner for “ water quality certificates ” for all plants pursuant to that section. It is the practice of the department, in reviewing these section 21 (subd. [b]) applications for thermal discharge permits to assume — in evaluating the effect of such discharges—that the plant under consideration will be bperated at maximum generating capacity on a continuous basis. It is apparent that, if each plant meets this test, energy used to pump the Cornwall Project could not possibly cause heated discharges in excess of applicable standards. Be that as it may, though, the Commissioner insured against the possibility of thermal pollution at other power generating stations by expressly providing—in condition “ G ” attached to his certification (supra, p. 42, n. 5) —that Con Ed will terminate operation of the facility “upon evidence that the temperátures of any of the waters of the State at any point, place or location ” exceed permissible standards “ resulting from the furnishing of power for use in connection with the operation of said facility.”

Conditions Attached to Certificates

As already noted, the Commissioner’s certificate contained four conditions. The first requires Con Edison to monitor the operation of the project and the other three provide-that it will terminate operation of the facility “ upon evidence ” that such *51 operation violates or threatens violation of required standards»Inclusion of such conditions was not, as the petitioners insist, a negation of the certification that there was a present reasonable assurance that the water standards will not be contravened. The conditions quite obviously relate to the future and, as the Commissioner stated, they were inserted “ In order * # * to insure that the [facility’s] operation * * * in the future will not contravene ” applicable water standards. In other words, they were attached to the certificate to provide ongoing reassurance that those standards will be satisfied in the years ahead. Indeed, the Commissioner was authorized to impose the conditions both by State law (ECL, § 17-0303, subd. 4, par. d; cf. Matter of Sperry Rand Corp. v. Water Resources Comm., 30 A D 2d 276, mot. for lv. to app. den. 24 N Y 2d 737)[8] and by section 21 (subd. [b]) of the Federal statute.[9]
Nor is there any basis for the claim that the Commissioner, by requiring Con Ed to monitdr the project operations, delegated his powers to the utility or surrendered his statutory authority. All that the certificate required was that Con Ed sample and test the quality of the River water on a continuing basis and make the results available to the Commissioner—standard practice, we are informed, in pollution control regulation (see Federal Water Pollution Control Act Amendments of 1972 [86 U. S. Stat. 816, 858], § 308 ; 37 Federal Register 24093 [1972], Code of Fed. Reg., tit. 40, § 124.61).
In short, then, there is no warrant for the petitioner’s claim that the conditions are invalid. Authorized by State law and by section 21 (subd. [b]), the conditions are reasonable and unquestionably advance the purpose of the latter provision.

!Possible Damage to Catskill Aqueduct

The petitioners also urge, and Special Term agreed with them, that the Commissioner should have required evidence *52 on, and assessed, the effect of the construction and operation of the Cornwall Project on the structural safety of New York City’s Catskill Aqueduct.
The Aqueduct is a water conduit which transports water from New York City’s reservoir in the Catskills to the city. (See Scenic Hudson Preservation Conference v. Federal Power Comm., 453 F. 2d 463, 478-480, supra.) It crosses deep below the Hudson Eiver at Cornwall at a point where the granite rock is suitable for such a crossing. Thus, the section of the Aqueduct tunnel on the Hudson’s west bank, known as the Moodna Tunnel, crosses horizontally some 400 feet beneath the surface in the vicinity of the site where the project powerhouse is to be built; as originally planned in 1963, it would have been at least 400 feet from the tunnel, a distance acceptable to the city. After the Federal court had reversed the Commission’s determination in 1965 (Scenic Hudson Preservation Conference v. Federal Power Comm., 354 F. 2d 608, supra), the powerhouse was redesigned — in order to meet objections that the project might impair the scenery of the area—to be placed entirely underground. Doing so, however, required that the tunnel and the powerhouse be closer together than originally planned. The city objected, in 1968, and refused to accept Con Edison’s proposal to relocate a section of the tunnel so as to maintain; a distance deemed acceptable to it. The Federal Power Commission ordered that the proceeding be reopened to consider evidence that location of the powerhouse at a distance of 140 feet from the tunnel, as now planned, might endanger the structural integrity of the Aqueduct. Following the taking of extensive engineering testimony from a number of the country’s foremost authorities on the subject, the Commission found that the Aqueduct’s safety would not be jeopardized and, on appeal, the Court of Appeals stated (453 F. 2d, at pp. 479, 480):
“ The Commission concluded that excavation of the powerhouse .site would not cause damage to the Moodna Pressure Tunnel, that controlled blasting during construction would not endanger the Aqueduct land, generally, that ‘ the probability of damage to the Aqueduct, is remote, ’ We think that there is substantial evidence *53 in the record to support the Commission’s determination. [p. 479]
# * *
“It is clear that the resolution of highly complex technological issues such as these was entrusted by Congress to the Commission and not to the courts. Where the Commission’s conclusions are supported by substantial evidence, the courts must accept them [p. 480] ”.[10]
We thoroughly agree with the Commissioner and Con Ed that it is improper to relitigate the Aqueduct matter in this proceeding. It is an issue already litigated between the same parties in the Federal courts and may well be concluded by the doctrine of res judicata. (See, e.g., City of Tacoma v. Taxpayers, 357 U. S. 320, 334 et seq., supra.)
However, quite apart from that, it is clear that the petitioners ’ argument misconceives the proper scope of the limited certificate proceeding pursuant to section 21 (subd. [b]). That provision, as previously noted, requires the State Commissioner merely to consider the water quality standards which may be affected by discharges from a proposed project into navigable waterways. The Aqueduct is, of course, a water main, not a stream. But even more important, the Cornwall Project will not discharge into the Aqueduct, and there is not the slightest suggestion that its contents would be polluted by the project. Presiding Justice Herlihy stated the matter succinctly and well in his opinion for the Appellate Division below (39 A D 2d, at pp. 305-306):
“ In regard to New York City’s contention that the implementation of the project may cause physical dam *54 age to ‘ The Catskill Aqueduct ’,- such a consideration has no bearing on water quality and if such damage does result, it is a matter of concern between the licensee and the city and the certificate issued by the appellant Commissioner is obviously not a permission by the State, to cause physical injury to another’s property. (Cf. Van Buskirk v. State of New York, 38 A D 2d 349.) It should be noted that the Federal Power Commission colxcluded from the evidence ‘ that the probability of damage tó the Aqueduct is remote ’.”
In conclusion* then, the Commissioner’s determination that there is reasonable assurance that construction and operation of the Cornwall Project would not violate applicable water quality standards — amply supported, as it is, by the record—was rational and reasonable.
The order appealed from should be affirmed, without costs.
Judges Bubké, Jasen, Gabbielli, Jones and Wachtleb concur; Judge Bbeitél taking no part.
Order affirmed.

. In October, 1971, the Federal Court of Appeals, on petitions for review, upheld the Commission’s determination. (See Scenic Hudson Preservation Conference v. Federal Power Comm., 453 F. 2d 463, cert. den. 407 U. S. 926.) In reaching that conclusion, the court wrote (p. 470): “In its opinion the Commission reviewed the power needs of the area served by Con Ed and considered possible alternatives to the Storm King project, in terms of reliability, cost, air and noise pollution, and -overall environmental impact. 6 * ®, It held that the scenic impact would be minimal, that no historic site would be adversely affected, that the fish would be adequately protected and that the proposed park and scenic overlook would enhance recreational facilities. The Commission found that further undergrounding of transmission lines would result in unreliability in the delivery of power and would be too costly. The Commission determined that construction of the project would entail no appreciable hazard to [New York City’s Catsltill] Aqueduct.”

. Fuel will be used at thé other plants, within their present legal authorization, and it is that fuel which will supply the pumping power for the project.

. The portion of the Hudson River from which the project will pump, and to which it will discharge, water has been assigned Class B standards (see, infra, pp. 45-46).

. These are the conditions which the Commissioner imposed:
“A. Consolidated Edison will continuously monitor the operation of said pumped storage hydroelectric generator facility in order to prevent any and all contravention of the water quality standards assigned to the Hudson River or any of the waters of the State attributable to the operation of said facility.
“ B. That Consolidated Edison will immediately terminate the operation of said project upon any evidence of violations or contravention of the water quality standards assigned to the Hudson River or any of the waters of the State attributable to the operation of said projects.
*43 “ C. That Consolidated Edison will immediately terminate the operation of said facility upon evidence that the temperatures of any of the waters of the State at any point, place or location, are affected so as to contravene the State’s thermal standard due to the operation of said facility, directly or indirectly as a result of the intake or discharges of water at or in the vicinity of the facility or at or in the vicinity of other affected body of water in the State resulting from the furnishing of power for use in connection with the operation of said facility.
"D. That Consolidated Edison shall immediately initiate any change in the operation of said facility which may be required to halt and reverse any significant salt water intrusions in any area of the Hudson River, caused by such operation, which may endanger, adversely affect or impair the use thereof as a public water supply to the extent of terminating operations if need be.”

. The Appellate Division’s order is termed a modification, rather than a reversal, in view of the fact that Special Term had dismissed the petitioners’ claim that the Commissioner should have considered and reviewed the scenic and aesthetic aspects of the propósed project.

. The act, it has been noted, “was the outgrowth of a widely supported effort on the part of conservationists to secure the enactment of a complete scheme of national regulation which would promote the comprehensive development of the nation’s water resources ” in a manner compatible with the environment. (Scenic Hudson Preservation Conference v. Federal Power Comm., 354 F. 2d, at p. 613; Scenic Hudson Preservation Conference v. Federal Power Comm., 453 F. 2d, at p. 467.) To assure appropriate environmental protection, the statute requires the Commission to determine that the proposed project “ shall be such as in the judgment of the Commission will be best adopted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, and for other beneficial public uses, including recreational purposes ” (U. S. Code, tit. 16, § 803, subd. [a]).

. Section 17-0303 (subd. 4, par. d) of the Environmental Conservation Law authorizes the Commissioner to “Issue or deny permits under such conditions as may be prescribed for the prevention and abatement of pollution ”.

. A regulation of the United States Environmental Protection Agency, issued pursuant to the Water Pollution Control Act, expressly prescribes that a State agency may include in the certificate required by section 21 (subd. [b] ) “ [a] statement of any. conditions which the certifying agency deems necessary or desirable with respect to the discharge or the activity ” (Code of Fed. Reg,, tit. 40, § 115.2, subd. [a], par. [4]).

. The court then went on to say that “ [i]t seems to us that it would be very difficult indeed to argue that the evidence supporting the Commission’s determination with respect to the Aqueduct is insubstantial. In fact the argument presented to us on this issue appears to be either that some higher burden of proof should he imposed with respect to the matter or that the city should bo able to exercise what, in effect, amounts to a veto power. However, there is no authority whatever to support the imposition of any greater burden of proof than that provided in the statutory standard and ‘ [s]uch a veto power easily could destroy the effectiveness of the federal act. It would subordinate to the control of the [city] the “comprehensive” planning which the Act provides shall depend upon the judgment of the Federal Power Commission or other representatives of the Federal Government.’ First Iowa Hydro-Electric Cooperative v. Federal Power Commission, 328 U. S. 152, 164” (453 F. 2d, at p. 480).