In the Matter of LONG LAKE ENERGY CORPORATION, Respondent, v NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Appellant.

Third Department, December 6, 1990

### APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Kathleen Liston Morrison* and *Peter H. Schiff* of counsel), for appellant.

*Donald B. Dillport* and *Sanford L. Hartman (Nixon, Hargrave, Devans & Doyle [Sean Mullany* and *David Spence]* of counsel), for respondent.

### OPINION OF THE COURT

WEISS, J. P.

It is now well established in this State that respondent, acting upon an application for State water quality certification of a hydroelectric project as a prerequisite to the issuance of a Federal license therefor under the Federal Water Pollution Control Act (also known as the Clean Water Act; *see,* 33 USC § 1251 *et seq.),* is solely limited to determining whether applicable water quality standards will be met in both the construction and operation of the project. Respondent is not empowered to base its decision on a balancing of the need for the project against the adverse environmental impact *(Matter*

*of Power Auth. v Williams,* 60 NY2d 315, 320). In the case before us, we are now called upon to revisit the several cases already decided on this subject, this time to identify components comprising the determination of water quality standards under 33 USC § 1341 (a) (1).

The facts in this lawsuit are as follows. In August and September 1987, petitioner applied for licensure of four hydroelectric projects by the Federal Energy Regulatory Commission (hereinafter FERC) to be constructed, operated and maintained *(see,* 18 CFR 4.38) at four different locations on the Oswego River in Oswego County.[1] Pursuant to 33 USC § 1341

---

1. Prior to applying for a Federal license to construct and operate a hydroelectric facility pursuant to 16 USC § 797 (e), an applicant must "consult with each appropriate Federal and state agency" (18 CFR 4.38 [a]). Federal regulations state that one of the "agencies to be consulted must include the appropriate certifying agency" under 33 USC § 1341 (18 CFR 4.38 [a]), which in New York is respondent (ECL 3-0301 [2] [j]). FERC is prohibited by 33 USC § 1341 (a) (1) from authorizing any facility which may discharge pollutants unless a State permit has been obtained or waived.

Under Federal regulations (18 CFR 4.38 [b] [1], [2], [3]), the prefiling consultation process consists of three stages. During the initial stage, an applicant contacts the appropriate Federal and State agencies and provides them with maps of the project area, a general engineering design, a summary of the operational mode, an identification of the affected environment and information about stream flow and the water regime (18 CFR 4.38 [b] [1]).

During the second stage of consultation, an "applicant must perform any reasonable studies that are necessary for [FERC] to make an informed decision regarding the merits of the application" (18 CFR 4.38 [b] [2]). The studies to be conducted include economic feasibility, the impact on "important natural or cultural resources", suitable mitigation or those necessary to minimize impacts to a significant resource (18 CFR 4.38 [b] [2] [i] [D]). The applicant must also provide each agency with a copy of its draft application, study results and a written request for review and comment (18 CFR 4.38 [b] [2] [iii]).

During the third stage of the consultation process, the applicant must document to FERC that "three requirements of all three stages of the consultation process have been fully satisfied" (18 CFR 4.38 [c]). This includes "[a]ny agency letters containing comments, recommendations, and proposed terms and conditions" (18 CFR 4.38 [c] [1]), as well as a copy of the water quality certification or a copy of the request for it and proof of "the date that the certifying agency received the request" (18 CFR 4.38 [c] [2] [ii]). If the certifying agency has failed to comment in a timely manner on a certificate request, the applicant must describe in detail its attempts to consult with that agency, the results of any partial consultations that occurred and any recommendations made by the agency (18 CFR 4.38 [d]). A certifying agency is deemed to have waived the certification requirements of the statute if it does not grant or deny water quality certifications within one year after the date the agency received the request for a permit (18 CFR
*(n. cont'd)*

(a) (1), petitioner was required to obtain certification from the proper State authority for each project. Petitioner submitted draft applications to respondent containing the information required to complete the initial stage of consultation under 18 CFR 4.38 (c).[2] Respondent answered in September 1987 by separate letters advising petitioner that the applications would be considered incomplete until the outstanding models that were necessary to evaluate the project's operational effect on navigation, flooding, water quality, fishery and other aquatic resources were provided to respondent for review. Respondent acknowledged that petitioner would require access to the project sites which were located on property owned by Niagara Mohawk Power Corporation in order to enable it to complete the site-specific requirements. Finally, respondent notified petitioner that it was necessary to submit the requested information within seven months to enable timely completion of the certification process and avoid automatic waiver resulting from its failure to certify or deny certification within one year of the application filings. Petitioner neither responded to the letters nor challenged the determination of incompleteness.

Commencing in December 1987, respondent answered each of the four applications in four lengthy letters covering all aspects of each proposed project pursuant to 18 CFR 4.38. In each letter respondent stated that, in general, it did not object to the projects, which would replace and upgrade existing generating facilities, provided the additional information requested was furnished. Each letter further stated that the operation of the projects without provision for continued spillage would not contravene applicable water quality standards, but each went on to state that respondent was concerned with site-specific water quality impacts, such as temperature and dissolved oxygen in the bypass section resulting from the construction and operation of the project. Respondent clearly stated that any license would require submission

---

4.38 [e] [2]). Respondent processes permit applications pursuant to the procedures and deadlines provided in ECL article 70 and 6 NYCRR part 621.

2. The applications were:
1. FERC project No. 9851, known as Upper Fulton, filed August 28, 1987.
2. FERC project No. 4668, known as High Dam, filed August 31, 1987.
3. FERC project No. 4682, known as Minetto, filed September 8, 1987.
4. FERC project No. 4685, known as Oswego, filed September 17, 1987.

of plans for review before construction began. Still no response from petitioner was received.

On August 26, 1988, respondent issued denial letters for each application, without prejudice, based upon petitioner's failure to respond to any of its requests for the additional information required to enable evaluation of and determinations on each of the four applications for certification. Response from petitioner came, for the first time, in the form of this CPLR article 78 proceeding.

Supreme Court granted petitioner's request to annul the determinations as arbitrary and capricious and unlawful, upon the finding that respondent could not look beyond issues of water quality on applications for certifications under 33 USC § 1341. Holding that respondent had already found that the projects, when operational, would not adversely affect water quality, Supreme Court directed respondent to issue the certificates. This appeal by respondent ensued.

Initially, we reject respondent's threshold argument that Supreme Court lacked jurisdiction to review the four denials of water quality certificates because those denials were nonfinal and thus not ripe for judicial review (see, CPLR 7801 [1]). Respondent's answer does not assert as a defense that the matter is not justiciable for failure to exhaust administrative remedies (see, Matter of Parent Teacher Assn. v Board of Educ., 138 AD2d 108, 111) and such argument was not raised before or reviewed by Supreme Court. Nevertheless, we recognize the exception to the general rule prohibiting matters being raised for the first time on appeal when the challenge is made upon jurisdictional objections (4 NY Jur 2d, Appellate Review, §§ 119, 120; see, Matter of Woodin v Lane, 119 AD2d 969; Strina v Troiano, 119 AD2d 566). While here there were no administrative hearings, respondent's decision to deny the four applications, albeit without prejudice, had its impact upon petitioner at that point and was final and binding (see, Matter of Edmead v McGuire, 67 NY2d 714, 716). Other than by reapplication de novo, there was no way for petitioner to prevent or significantly ameliorate the certainty and immediacy of harm by further administrative action (see, Matter of Parent Teacher Assn. v Board of Educ., supra, at 112).

Respondent's reliance upon Church of St. Paul & St. Andrew v Barwick (67 NY2d 510, cert denied 479 US 985) is misplaced. That case was an action for declaratory judgment brought under CPLR 3001 seeking a declaration that the New

York City Landmarks Preservation Law was unconstitutional as applied to the plaintiff, and for an injunction and damages. While in that case there had not been any administrative action, here respondent had already denied petitioner's applications.

Similarly, in *Power Auth. v Department of Envtl. Conservation* (379 F Supp 243), cited by petitioner, the complaint sought a mandatory injunction and declaratory relief alleging that respondent was without authority to hold hearings on the question of whether it should issue a certificate for water discharge from a proposed power plant *(see,* 33 USC § 1341 [a] [1]). The plaintiff there had moved for a preliminary injunction to prevent the hearings on the ground that the issue itemized for hearings had been preempted under the Federal statute by the exclusive jurisdiction of the Federal Power Commission (predecessor to FERC). District Court granted a cross motion to dismiss made by respondent, the defendant in that case, holding that "a case or controversy [did] not presently exist and a declaratory judgment should not be issued because the 'challenged governmental activity' [was] only the right of a state administrative agency to hold hearings on matters it believes to be in its jurisdiction" *(Power Auth. v Department of Envtl. Conservation, supra,* at 248). Certification had neither been granted nor denied in that case, nor had any other action been taken that had any impact upon the pending license application made to the Federal Power Commission. Here, in contrast, respondent had actually denied the requests for the certificates, which would trigger FERC action, thereby placing petitioner's license applications at risk. Since an actual, concrete injury to petitioner was immediate *(see, Williamson Planning Commn. v Hamilton Bank,* 473 US 172, 193), and for the reasons herein stated, we reject respondent's argument that Supreme Court lacked jurisdiction.

■ Turning to the merits, we first recognize that since a public hearing had not been held, the appropriate standard for judicial review is whether respondent's determinations were made in accordance with law, were arbitrary and capricious, or lacked a rational basis *(see, Matter of Giles v State Div. of Human Rights,* 166 AD2d 779, 780; *see also, Matter of deRham v Diamond,* 32 NY2d 34, 40).

Our analysis begins with review of the role that respondent plays in the licensing process. We note that 33 USC § 1341 (a) (1) prohibits the issuance of a license by FERC to construct a hydroelectric power plant to a facility which would result in a

"discharge into the navigable waters" unless, in this case, the State either issued a certificate that the facility would comply with its water quality standards (33 USC § 1313) or waived such certification (33 USC § 1341 [a] [1]). In its exercise of the certification process, a State which has water quality concerns about the licensing activities of Federal agencies, including FERC, possesses what has been likened to a veto power. This is because 33 USC § 1341 expressly prohibits the Federal agencies from issuing licenses unless the State water quality certification required in 33 USC § 1341 has either been obtained or waived. Petitioner, in its brief, does not dispute this fact but questions the extent to which that veto power may be stretched to block these hydroelectric projects by arguing that respondent's considerations in reaching its determinations extended beyond issues relating solely to water quality. The case of *Matter of deRham v Diamond (supra)* is instructive. There, the Court of Appeals said that the statute:[3] "relinquishes only one element of the otherwise exclusive jurisdiction granted the [Federal] Power Commission * * *. It authorizes States to determine and certify only the narrow question whether there is 'reasonable assurance' that the construction and operation of a proposed project 'will not violate applicable water quality standards' of the State. That is all that [the statute] did, and all that it was designed to do. Congress did not empower the States to reconsider matters, unrelated to their water quality standards, which the [Federal] Power Commission has within its exclusive jurisdiction under the [statute]" *(supra,* at 44).

The issue in this case thus distills to whether respondent's considerations of water quality standards disregarded the very limited nature of the activity left by 33 USC § 1341 to State action in the certification process. Again, we find guidance in *Matter of Power Auth. v Williams* (60 NY2d 315, *supra),* where the Court of Appeals determined that: "The certification referred to in [33 USC § 1341], insofar as relevant * * * is simply of compliance with [33 USC § 1313], which provides for either State-adopted, Federally approved water quality standards or the promulgation of standards by the Federal Environmental Protection Agency. In the case of New York State, the standards adopted by [respondent] and Federally approved

3. The Court of Appeals in *Matter of deRham* was dealing with 33 USC former § 1171 (b), the predecessor statute to 33 USC § 1341. The former statute is now codified in substantially the same form in 33 USC § 1341 (a) (4).

establish use classifications of waters within the State with specific, individual standards, relating to such things as *turbidity and temperature change,* assigned to the various classifications (e.g., 6 NYCRR 701.4, 704.2 [b]). The * * * certification process is accomplished by a determination that a proposed project will meet the particular water quality standards for the applicable classification" *(supra,* at 326-327 [emphasis supplied]). Since "such things as turbidity and temperature change" are clearly factors affecting water quality, respondent neither exceeded the scope of its authority nor was irrational in requesting additional information from petitioner which would require those elements to be considered[4] *(see,* ECL 17-0301; 6 NYCRR parts 701, 704).

Examination of the initial responses by respondent to the applications shows that the State expressed its concern about the "site specific water quality impacts, i.e. temperature and summertime dissolved oxygen (D.O.)". Respondent stated that it was concerned that a proposed "no flow" scenario for an 800-foot reach of the natural riverbed 80% of the time for a normal hydrologic year would "result in the degradation of water quality * * * in particular, during the low-flow summer months when the river experiences high temperatures and low D.O. conditions". Respondent also stated that it required additional information about the flow through the bypass for flushing purposes and that the application did not contain sufficient information to determine the flows necessary to maintain and enhance the fishery and associated aquatic resources. Respondent recommended that petitioner, along with the United States Fish and Wildlife Service and itself, conduct a study to be included as part of the application.

Thus, the letters clearly indicated that a review was in progress and that more information was required to complete the review. It cannot be said that respondent's study, coupled with its consideration and response to the applications, was irrational, arbitrary or capricious since the components of water quality as expressed in the statute, regulations and cases, clearly included those factors upon which more information was requested and to which petitioner failed to respond. Of particular significance is the fact that petitioner never answered any of respondent's letters or requests for informa-

---

4. In *Matter of deRham v Diamond* (32 NY2d 34, *supra),* the Court of Appeals intimated that a proposed facility's effect on fish life, salt water intrusion and possible thermal pollution are proper areas for review by respondent and are covered by "water quality".

tion. Petitioner's argument, advanced before Supreme Court and again on this appeal, that respondent had found that the proposed facilities would comply with water quality standards, is unpersuasive. A reading of the letters from respondent clearly and unequivocally demonstrates beyond cavil that respondent had not finally found that the projects would not have an adverse impact upon water quality so as to require its certification of the projects. On the contrary, that expression of noncontravention of water quality standards included the need for additional information to identify and evaluate water quality impacts from the construction and operation and stated that conditions would have to be imposed upon any license issued to require submission of the plans for its review prior to any construction.

Finally, it is significant to note that petitioner could have objected to any of the requests made by respondent at the administrative level, but chose not to do so *(see, Power Auth. v Department of Envtl. Conservation,* 379 F Supp 243, 247, *supra).*

In sum, respondent's determinations were rationally based and fully supported by the record. Supreme Court's judgment annulling those determinations must therefore be reversed.

MIKOLL, LEVINE, MERCURE and HARVEY, JJ., concur.

Judgment reversed, on the law, without costs, determinations confirmed and petition dismissed.