OPINION OF THE COURT
 

 Bellacosa, J.
 

 The New York State Department of Environmental Conservation (DEC) appeals by leave granted from this Court to review the Appellate Division’s order affirming Supreme Court’s judgment in favor of Niagara Mohawk Power Corporation. We agree with both courts that the DEC’S effort to broaden its scope of review under the Clean Water Act to include aspects of ECL article 15 is unfounded. For purposes
 
 *194
 
 of issuance of a Clean Water Act § 401 (33 USC § 1341) State certification, DEC is limited to considering the water quality standards set forth by the State and approved by the United States Environmental Protection Agency under section 303 of the Clean Water Act (33 USC § 1313). We are satisfied that Federal preemption principles and policies along with settled precedents interpreting the complementary statutory scheme of Federal-State regulatory authority support an affirmance of the Appellate Division order.
 

 L
 

 Niagara Mohawk, a private investor-owned utility company licensed under the Federal Power Act, owns and operates hydroelectric facilities throughout the State. It applied to the Federal Energy Regulatory Commission (FERC) for a license to approve construction of several new facilities, dam repair and reconstruction work on existing dams and anticipates filing similar applications in the future.
 

 Under section 401 of the Federal Clean Water Act, before approval of a Federal license, a facility must obtain a "certification” from the State regulatory entity — in this case, the DEC — that the discharge from the new or altered facility meets with relevant State water quality standards. Basically, water quality standards are provisions of State and Federal law, which define the quality goals of a water body or some portion of it, by designating the use or uses to be made of the water, by setting criteria necessary to protect the uses, and by incorporating an antidegradation policy designed to prevent the gradual deterioration of the quality of the water body. These criteria are elements of State water quality standards, expressed as constituent levels or narrative statements, representing a quality of water that supports a particular use. States adopt a broad array of water quality standards to protect the public health or welfare, enhance the quality of water and serve the purposes of the Clean Water Act, which, in turn, serve to protect fish, wildlife, recreational use and, ultimately, aid in the use of the water for public water supply.
 

 Niagara Mohawk did not apply for a State section 401 certification and, instead, initiated a threshold challenge alleging that DEC has officially declared its intent and jurisdiction to review Niagara Mohawk’s applications under ECL article 15 in super arrogation of the Federal Power Act. Niagara Mohawk proceeded by application to DEC in May 1990 pursu
 
 *195
 
 ant to section 204 of the State Administrative Procedure Act for a declaratory ruling that ECL article 15, title 5 is not applicable to a section 401 certification, and that the Federal Power Act (16 USC § 791a
 
 et seq.)
 
 preempts and limits DEC’S reviewing scrutiny to specific State provisions as they pertain to the question of whether the project will affect the State’s water quality as prescribed in 6 NYCRR parts 701 to 704.
 

 By letter opinion dated August 27, 1990, DEC declared that projects proposed by Niagara Mohawk must also satisfy multiple provisions of the Environmental Conservation Law, including the regulatory requirements of the State Environmental Quality Review Act (ECL art 8) before it will issue the requisite Clean Water Act § 401 certification.
 

 DEC opined that by enacting section 401, Congress intended the States to have authority to exact compliance with all State laws which bear on water quality before granting a certification. DEC declared the following laws to be applicable in assessing issuance of the "certification” under a section 401 review:
 

 (a) Protection of Waters: disturbance of stream beds (ECL 15-0501);
 

 (b) Protection of Waters: dam construction (ECL 15-0503);
 

 (c) Protection of Waters: excavation or fill (ECL 15-0505);
 

 (d) Dam Safety (ECL 15-0507);
 

 (e) Reservoir Release (ECL 15-0801
 
 et seq.);
 

 (f) Wild, Scenic and Recreational River System (ECL 15-2701
 
 et seq.);
 

 (g) Freshwater Wetlands (ECL art 24);
 

 (h) Fish and Wildlife (ECL art 11); and
 

 (i) Environmental Quality Review (ECL art 8).
 

 Niagara Mohawk invoked CPLR article 78 review and brought a declaratory judgment action seeking annulment of DEC’S ruling. Its requested relief included a determination that the Clean Water Act § 401 certification process allows the DEC, from the State law’s standpoint and involvement, to consider the water quality standards set forth only in 6 NYCRR 701.19 and 704.2.
 

 Supreme Court granted judgment to Niagara Mohawk, allowing only a " 'determination that a proposed project will meet the particular water quality standards for the applicable
 
 *196
 
 classification.’ ” Supreme Court limited DEC to review under 6 NYCRR 701.19 and 704.2, recodified in substantially the same form and contained within 6 NYCRR parts 701 to 704 (eff Sept. 1, 1991). The Appellate Division affirmed, holding DEC was restricted to the application of turbidity and temperature change as specified by 6 NYCRR 701 to 704 and concluding that it could not impose additional water quality analysis conditions to its section 401 certification.
 

 IL
 

 We agree with the Appellate Division that the Federal Power Act establishes a comprehensive scheme of Federal regulation of hydroelectric projects that essentially preempts State regulation of hydroelectric facilities within the Federal Energy Regulatory Commission’s jurisdiction. Settled law in New York has consistently supported the view that section 401 gives the State regulatory entity only a limited role of review, based on requirements affecting water quality, not on all State water quality provisions. Review by State agencies that would overlap or duplicate the Federal purview and prerogatives was not contemplated and would infringe on and potentially conflict with an area of the law dominated by the nationally uniform Federal statutory scheme.
 

 Niagara Mohawk’s hydroelectric projects are subject to regulation under part I of the Federal Power Act, which vests in the FERC comprehensive authority over the construction, operation and maintenance of hydroelectric facilities located on the navigable waters of the United States (16 USC § 797 [e]; § 817 [1]). FERC is required to evaluate and ensure that a given project is founded on a comprehensive plan for the adequate protection and enhancement of wildlife and beneficial public uses, including irrigation, flood control and recreational use (16 USC § 803 [a] [1]; § 797 [e]; Electric Consumers Protection Act, added by Pub L 99-495, 100 US Stat 1243).
 

 In addition, Niagara Mohawk’s projects are controlled by the Clean Water Act, which in "anticipating] a partnership between the States and the Federal Government”
 
 (Arkansas v Oklahoma,
 
 503 US —, —, 112 S Ct 1046, 1054), establishes a system for effluent restrictions applicable to different categories of sources of water pollution (33 USC §§ 1311, 1312, 1313, 1316 and 1317), and defines the role for the States in controlling water pollution.
 

 Under section 303 of the Clean Water Act (33 USC § 1313),
 
 *197
 
 States are authorized to establish "water quality standards” consisting of the "designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses” (33 USC § 1313 [c] [2] [A]). DEC concedes that in New York the water quality standards promulgated pursuant to Clean Water Act § 303 are found only in 6 NYCRR parts 701 to 704. That tie-in is highly relevant.
 

 Section 401 of the Clean Water Act also serves as the conduit for the incorporation of relevant State water quality standards in this otherwise Federally filled universe. An applicant for a Federal license or permit authorizing an activity that may result in a discharge into navigable waters must provide "a certification from the State in which the discharge originates or will originate * * * that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of [the Clean Water Act]” (33 USC § 1341 [a] [1]). The State must act on a request for certification within a reasonable time of receipt, and if the State denies the certification, the Federal agency may not issue the license or permit.
 

 ¡IL
 

 In 1973,
 
 Matter of de Rham v Diamond
 
 (32 NY2d 34) held that section 21 (b) of the Federal Water Pollution Control Act (33 USC former § 1171 [b]):
 

 "[Relinquishes only one element of the otherwise exclusive jurisdiction granted the Power Commission by the Federal Power Act. It authorizes States to determine and certify only the narrow question whether there is 'reasonable assurance’ that the construction and operation of a proposed project 'will not violate applicable water quality standards’ * * * Congress did not empower the States to reconsider matters, unrelated to their water quality standards”
 
 (id.,
 
 at 44).
 

 Nevertheless, DEC relies heavily on a replacement of section 21 by the Federal Water Pollution Control Act Amendments, later codified as section 401 of the Clean Water Act (33 USC § 1341), as indicating a new and different approach by Congress. It suggests that Congress was shifting focus away from the quality of a given body of water to a greater emphasis on regulating the discharge of effluent and pollution at its source, and somehow that this was designed to release some of
 
 *198
 
 the exclusive Federal power to the States. These amendments in 1972, however, had no impact on this Court’s decision in
 
 de Rham.
 
 Nor did these amendments impress this Court 10 years later in 1983, when, in
 
 Matter of Power Auth. v Williams
 
 (60 NY2d 315, 326-327), we again held that the new section 401 certification process is still accomplished by a determination that a proposed project will meet the particular water quality standards related to the applicable classification
 
 (see also, Matter of Long Lake Energy Corp. v New York State Dept. of Envtl. Conservation,
 
 164 AD2d 396, 401-403). Thus, the Appellate Division correctly noted that under settled New York law, such a broad reach is beyond DEC’S limited delegated powers.
 

 The DEC determination of August 27, 1990, under review in this case, would have a section 401 applicant supply information only indirectly related to water quality. It seeks to change the thrust of analysis and the force of our precedents by asserting that section 401 today is different in its impact and relationship to the States because of the Clean Water Act. In effect, DEC asks this Court to open the dam of section 303 with respect to the section 401 certification process. DEC insists that by altering the wording of section 1341 in 1972 and then again in 1977 when creating the Clean Water Act, Congress returned to the States plenary power over water quality, eliminating its earlier preemption prerogatives under the 1935 Federal Power Act. Part of its argument turns on the fact that Congress’s decision not to include a limiting reference to section 303 (water quality standards) in section 401 (d), which deals with a State’s power to impose conditions on a certification, indicates that Congress did not mean to restrict conditions on certifications only to those necessary to assure compliance with section 303 water quality standards. This is especially so, it argues, since Congress did reference section 303 in section 401 (a) (1), (3), (4) and (5) and omitted it from section 401 (d).
 

 To support this highly significant turnabout in law and policy and in the distribution of exclusive and complementary Federal-States power, DEC also points us to
 
 State of Washington v Public Utility Dist. No. 1
 
 (121 Wash 2d 179, 849 P2d 646 [1993],
 
 cert granted
 
 — US —, 114 S Ct 55). To be sure, the Washington Supreme Court, in construing section 401 (d), has enunciated a broader view of its State’s authority under that provision. The Supreme Court of Washington considered the language Congress chose within the context of the Clean Water Act itself, noting Congress’s "broad purpose” in enact
 
 *199
 
 ing the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation’s waters”
 
 (id.,
 
 121 Wash 2d, at 189, 849 P2d, at 651). The court, therefore, broadly construed the power granted to the States under its view of section 401 because the Clean Water Act stated its purpose in broad terms. "This broad purpose suggests that what state laws qualify as 'appropriate’ for purposes of section 401 (d) should also be understood broadly”
 
 (id.,
 
 121 Wash 2d, at 189, 849 P2d, at 651-652). The court then noted:
 

 "If Congress intended to refer only to state water quality standards [in section 401 (d)], it could have specifically referred to them. That Congress did not do so is evidence that it intended the phrase 'any other appropriate requirement of State law’ to refer broadly to all state water quality-related laws, not just to state water quality standards adopted pursuant to section 303 [of the Clean Water Act, 33 USC § 1313]”
 
 (id.,
 
 121 Wash 2d, at 190, 849 P2d, at 652).
 

 This same type of analysis has been followed by the Oregon intermediate appellate court in
 
 Arnold Irrigation Dist. v Department of Envtl. Quality
 
 (79 Ore App 136, 717 P2d 1274, 1279,
 
 review denied
 
 301 Ore 765, 726 P2d 377 [1986]). Whatever the outcome in the Supreme Court of the United States, we respectfully reach a different conclusion from those courts based on our analysis and our precedents.
 

 DEC claims that the replacement of section 21 by section 401 (d) by Congress in 1972 which changed the phrase "applicable water quality standards” to the broader phrase "any other appropriate requirement of State law” (33 USC § 1341 [d];
 
 see also,
 
 Senate Conference Report No. 92-1236 accompanying S 2770 [enacted as Pub L 92-500],
 
 reprinted in
 
 1972 US Code Cong & Admin News 3776, 3815) dictates a conclusion that a section 401 review encompasses all applicable State water quality standards. One initial problem with this phase of the argument that persuades us to reject this view is that section 401 (d) does not control the analysis or outcome here. That subdivision applies only to the conditioning authority on a certificate issued by DEC. DEC’S enlarged reading of "appropriate requirement of State law” under section 401 (d) would enable DEC to impose onerous conditions that could contradict or undermine Federal licensing by superimposing unrelated conditions not within the EPA mandates and specifications.
 
 *200
 
 Such a strained construction would countermand the carefully worded authority of section 401 (a) (1). To permit DEC, through the conditioning power of subdivision (d), to usurp the authority that Congress reserved for FERC under the Federal Power Act, over issues beyond water quality standards directly relevant to the section 401 certification process, is not justified and would constitute unfounded statutory construction.
 

 The Clean Water Act reads simply that a certification shall issue if a determination is reached "that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of this Act” (33 USC § 1341 [a] [1]). Unlike the EPA-issued effluent limitations and new source performance standards mentioned in section 401 (a) (1)
 
 (see,
 
 33 USC §§ 1311, 1312, 1316, 1317), section 303 water quality standards are promulgated by each State
 
 (see,
 
 33 USC § 1313), but even section 303 standards must be approved by EPA through a process delineated in section 303 (33 USC § 1313 [c]).
 

 DEC concedes that in New York the water quality standards promulgated pursuant to section 303 are linked and found only in 6 NYCRR parts 701 to 704. Thus, there is nothing in the new language or legislative history of section 401 that would empower DEC to deny certification on the basis of broader environmental provisions of New York law or regulation, nor is there adequate support for DEC’s contention that the operation and reach of section 401 has been altered in a way that requires this Court to upset its settled analysis and resolution of the interrelated questions in
 
 Matter of de Rham v Diamond
 
 (32 NY2d 34,
 
 supra)
 
 and
 
 Matter of Power Auth. v Williams
 
 (60 NY2d 315,
 
 supra).
 

 Additional support for our conclusion may be found in the Congressional expression when it amended section 401 in the Senate Report that "it is reasonable to require that Federal permits and licenses should take into account State water quality plans, standards and requirements adopted under section 303 to assure maintenance of water quality in the respective States” (Senate Report No. 95-370, accompanying S 1952 [Pub L 95-217], at 72-73,
 
 reprinted in
 
 1977 US Code Cong & Admin News 4397-4398).
 

 Therefore, while DEC is correct that Congress sought in section 401 to preserve the States’ role in maintaining water quality, Congress simultaneously maintained essentially preemptive Federal control by restricting State certification to
 
 *201
 
 compliance with requirements issued or approved by EPA. Congress envisioned that the States’ role would be fulfilled through the water quality standards adopted in harmony with and under Clean Water Act § 303
 
 (Matter of Power Auth. v Williams,
 
 60 NY2d, at 326-327,
 
 supra)
 
 and therefore, in this case, only in relation to 6 NYCRR parts 701 to 704.
 

 We have considered all arguments advanced by the parties and conclude that an affirmance is warranted.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Smith and Levine concur; Judge Hancock, Jr., taking no part.
 

 Order affirmed, with costs.