In the Matter of DUFLO SPRAY-CHEMICAL, INC., et al., Petitioners, v THOMAS C. JORLING, as Commissioner of the New York State Department of Environmental Conservation, Respondent.

Third Department, January 25, 1990

APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle (David L. Cook* and *Thomas S. West* of counsel), for petitioners.

*Robert Abrams, Attorney-General (Martha McCabe, Peter H. Schiff* and *Val E. Washington* of counsel), for respondent.

## OPINION OF THE COURT

MERCURE, J.

Petitioner Duflo Spray-Chemical, Inc. (hereinafter petitioner) is a corporation which has engaged in the commercial aerial application of pesticides since 1955, using specially equipped airplanes. Petitioner Jeffrey T. Duflo (hereinafter Duflo) is the president of petitioner and a certified pesticide applicator. Petitioner has, for a number of years, contracted with many Adirondack area municipalities for aerial spraying to control blackflies and mosquitoes. During 1984 and 1985, petitioner applied pesticides pursuant to contracts with, *inter alia,* the Town of Colton, St. Lawrence County, the Town of Black Brook, Clinton County, and the Town of Arietta, Hamilton County. To control adult blackflies and mosquitoes, petitioner used a pesticide known as Dibrom-14.

In the spring of 1984, the Department of Environmental Conservation (hereinafter the Department) received complaints about pesticide spraying over Silver Lake in the Town of Black Brook. It responded by collecting samples from several locations near Silver Lake after a plane owned by petitioner sprayed in the vicinity of the lake on June 21, 1984. Two of the samples taken contained Naled, the active ingredient of Dibrom-14. In June 1985, also as a result of resident complaints, the Department set up sampling sites at Arbuckle Pond in the Town of Colton. On June 17, 1985, one of petitioner's planes sprayed the area and Dibrom-14 or a derivative was detected in some of the samples taken. On July 20, 1985, once more in response to a complaint, a Department police officer went to Piseco Lake in the Town of Arietta and saw one of petitioner's planes spraying over the lake. Thereafter, a Department employee went to petitioner's office and requested its records for several dates in 1985. Duflo provided information from petitioner's daily logs, but the logs did not set forth the rate and method of application and the target organism for each date.

In February 1987, the Department commenced an administrative enforcement action against petitioners. The complaint alleged 19 causes of action, including spraying over water without a permit (6 NYCRR 329.1), failure to apply pesticide in accordance with its label (6 NYCRR 325.2 [b]) and contamination of nontarget areas (6 NYCRR 325.2 [a]) at Arbuckle Pond, Silver Lake and Piseco Lake; failure to timely file annual reports (6 NYCRR 325.25 [b]); and failure to list all information for each flight (6 NYCRR 325.25 [a]). Following a hearing, the Hearing Officer dismissed eight causes of action and sustained the remainder. The Hearing Officer recommended fines of $5,000 for record-keeping violations and $10,000 for other violations. Respondent concurred and ordered payment of a $15,000 penalty. This CPLR article 78 proceeding challenging respondent's order was commenced in Supreme Court and transferred to this court pursuant to CPLR 7804 (g).

Addressing petitioners' first claim, that respondent erred in sustaining the contamination violations, we note that "contamination" is defined in 6 NYCRR 325.1 *(l)* as "the presence of a pesticide * * * in or on areas other than the target area, *in quantities which are or may be injurious to man or the environment*" (emphasis supplied). Petitioners contend that, to prove a violation of 6 NYCRR 325.2 (a), respondent had to show (1) presence of pesticide and (2) a quantity which is or may be injurious to man or the environment, and that respondent has failed to prove the second element. Respondent, on the other hand, equates any entry of Dibrom-14 into nontarget waters as "contamination" in violation of the regulation.

While the courts will generally defer to an agency's interpretation of its regulations, it is also "axiomatic that an agency is bound by the language of its own regulation and cannot construe it in such a manner that the plain language on the face of the regulation is rendered meaningless" *(Matter of Grace Plaza v Axelrod,* 121 AD2d 799, 801; *see, Matter of Frick v Bahou,* 56 NY2d 777, 778). Here, the regulations state that pesticides must be used so that *contamination* is prevented, and define "contamination" as presence *in quantities* which may injure the environment. Clearly, this regulatory scheme contemplates more than the mere presence of a pesticide but, rather, presence in quantitatively injurious

amounts.[1] In the absence of evidence of the concentration of Dibrom-14 present in the bodies of water and expert opinion that such concentration was actually or potentially injurious to man or the environment, the causes of action alleging contamination must fail. Although there is evidence in the record that samples taken near Silver Lake showed 10 ug (micrograms) and 5.6 ug of Dibrom-14 in one-half quart of water and a sample near Arbuckle Pond showed 13 ug in 400 milliliters of water, there is no evidence that these constituted potentially or actually injurious levels of the substance. Contrary to respondent's argument that no level of Dibrom-14 is safe, the Department of Health has indicated that tolerances from Dibrom in edible foods have been established and that residues of 0.5 to 3 parts per million (ppm) are allowed in a variety of fruits and vegetables. Accordingly, we conclude that respondent cannot rationally sustain the determinations of contamination as alleged in the causes of action numbered 8, 10 and 13.

We next turn to petitioners' contention that respondent erred in finding that petitioner applied Dibrom-14 in a manner inconsistent with the label directions. The portion of the label designated "ENVIRONMENTAL HAZARDS" stated in part: "This product is toxic to fish, birds and other wildlife. Keep out of lakes, streams and ponds. Direct application to water is prohibited." The portion designated "DIRECTION—ADULT MOSQUITO CONTROL" included the following: "Treat shrubbery and vegetation where mosquitoes may rest. Shrubbery and vegetation around stagnant pools, marshy areas, swamps * * * may be treated."[2] Respondent found that petitioner had, on a number of occasions, sprayed Dibrom-14 so that it fell directly into the waters of the State.

At the hearing, Duflo testified that he believed Dibrom-14 could not be directly applied to water as a larvicide, but could

---

**1.** Notably, respondent relied on similar reasoning in failing to sustain charges of contamination of private property in this case, stating "the record does not adequately support a finding that the applications on the lands * * * might be injurious * * * due to a lack of evidence showing general or site specific impacts that would rise to such a level".

**2.** Petitioners' discussion of the amendment of the Dibrom-14 label and the effect of this change on this case is irrelevant. Accepting the label as amended, as petitioners demand, it reads, in pertinent part: "This product is toxic to fish, aquatic invertebrates and wildlife. *Do not apply directly to water.* Runoff from treated areas may be hazardous to aquatic organisms in neighboring areas" (emphasis supplied). In our view, this new language does not alter the above analysis or the rationality of respondent's interpretation.

be applied in accordance with the label instructions as a space treatment to kill adult insects in the air over water. To support this argument, petitioners introduced a letter from Chevron Chemical Company, the manufacturer of Dibrom-14, which states that the language "direct application to water is prohibited" was added to the label to eliminate any use of the pesticide as a larvicide at the suggestion of the Federal Environmental Protection Agency, "even though it would cause some confusion with the *general use directions* where it clearly states that the product can be used around stagnant pools, marshy areas, swamps, etc." (emphasis in original). Respondent, in finding the label violations, stated: "The label instructions for Dibrom-14 prohibit direct application to water. These instructions are intended to proscribe all direct entry into water and not simply those that involve larvicide treatments. * * * Where application is near a body of water, the inability to ensure the avoidance of such water simply means that aerial treatment is not permissible" (emphasis in original).

■ Although petitioners' interpretation of the label is not unreasonable, particularly in light of the letter from Chevron, respondent's interpretation must be upheld since it involves the special competence and expertise of the administrative agency and is neither irrational nor unreasonable *(see, Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459). The label does "prohibit" any direct application of Dibrom-14 to water, and does not distinguish "space treatments". Moreover, although the "ADULT MOSQUITO CONTROL" portion of the label states that "[s]hrubbery and vegetation *around* stagnant pools, marshy areas, swamps * * * may be treated" (emphasis supplied), this language may rationally be read so as not to apply to aerial spraying since there are separate label instructions for "ultra low volume aircraft application" and "airplane application" which do not specify that swampy or marshy areas may be treated. It is our view, therefore, that petitioner may be found to have violated 6 NYCRR 325.2 (b) if any aerial application, either as a larvicide or as a space treatment, was made *directly* over State waters.

■ ■ Petitioners' remaining contentions do not require extended discussion. First, we reject the claim that respondent's findings as to violations for direct application of Dibrom-14, without a permit, to the waters of Arbuckle Pond, Silver Lake and Piseco Lake were not supported by substantial evidence. The evidence relied upon by respondent included

statements of eyewitnesses to each of the incidents of spraying, test samples showing the presence of Dibrom-14 at Arbuckle Pond and Silver Lake, and petitioner's own records. That petitioners offered contrary evidence concerning flight paths and areas of application is of no moment. The choice of conflicting testimony is properly for the Hearing Officer and respondent *(see, Matter of Wayering v County of St. Lawrence,* 140 AD2d 838). Similarly, the fact that the testing methods used may have been questionable merely went to the weight to be accorded the evidence *(see, supra).* Finally, we reject petitioners' contention that the portion of the fine imposed for record-keeping violations was not in accord with the Department's internal guidelines. Contrary to petitioners' argument, the Department's internal guidelines on penalties are not binding rules or regulations since they are not "fixed, general principle[s] to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme" *(Matter of Roman Catholic Diocese v New York State Dept. of Health,* 66 NY2d 948, 951). Nor was the penalty excessive. Given the seriousness of the violation arising out of the failure to report methoxychlor use, the penalty does not shock one's sense of fairness and therefore should not be disturbed *(see, Matter of Pell v Board of Educ.,* 34 NY2d 222, 233).

CASEY, J. P., MIKOLL, YESAWICH, JR., and LEVINE, JJ., concur.

Determination modified, without costs, by annulling so much thereof as sustained causes 8, 10 and 13, alleging violations of 6 NYCRR 325.2 (a); causes 8, 10 and 13 dismissed and the fines imposed thereon annulled; and, as so modified, confirmed.