OPINION OF THE COURT
Karen K. Peters, J.
This proceeding, brought before the court pursuant to CPLR article 78 was commenced for the sole purpose of reviewing the manner in which the Commissioner of the New York State Department of Environmental Conservation (DEC) imposed the underlying civil penalty pursuant to ECL 71-2103.
Petitioner, Sherwood Medical Co. (Sherwood), manufactured and sterilized medical equipment up until June of 1990 at a facility owned and operated by it in the Village of Sherburne, Chenango County, New York. During the relevant period from July 1, 1987 to May 6, 1988, it is undisputed that the sterilization of such equipment was accomplished by exposing the various products to ethylene oxide (EtO) in a sealed sterilization chamber under tightly controlled pressure, temperature, humidity and timing requirements. Each cycle commenced with the loading of medical equipment onto pallets into the sterilization chamber. At the end of the predetermined exposure period, a series of air washes gradually reduced the concentration of EtO in the chamber. This was accomplished by venting the EtO through a stack which received a series of injections of fresh air, thus termed the "air wash” cycle. At the conclusion of the air wash cycle, Sherwood personnel opened the chamber doors, removed the products, and the process was completed.
The entire cycle of loading unsterilized equipment into the chamber, exposing the products to EtO, venting the EtO, and removing the sterilized equipment took from 16 to 22 hours depending upon the standards predetermined for that particular product by the Federal Food and Drug Administration. The venting of the EtO from the chamber took approximately 3Vz hours of the total 16-to-22-hour cycle. Petitioner contends that as soon as one cycle ended, the next was started and therefore the sterilization process continued five to seven days per week except for holidays, maintenance, repair and scheduling difficulties.
In the early 1980’s, the previous owner of the facility vented *283 the EtO directly into the atmosphere. Through a consent order with the DEC in 1982, Sherwood agreed to design and install absorber and reactor systems known as a DEOXX system, designed to remove 99% of the EtO from the exhaust systems of the sterilizing units. Pursuant to that agreement, such revised system was put into place at the Sherwood facility. When the DEOXX system was working, the gas from the sterilization chamber was discharged into the DEOXX system during the venting phases of sterilization. While in the DEOXX, the EtO was dissolved in water then acidified to convert the EtO into ethylene glycol, a liquid. After the acidity of the ethylene glycol water mixture was reduced by this treatment, the DEOXX system was designed to discharge the waste water into the public sewer system.
In 1987, Sherwood discovered that waste water discharge from the DEOXX system was not meeting the acidity standard of the local sewer plant because of faulty design and installation. In July 1987, Sherwood commenced construction of a new neutralization system to treat the DEOXX waste water properly before discharge to the sewer. During the 10-month period of construction, Sherwood, without consulting the DEC, disconnected the DEOXX system attached to one of the sterilizing units and continued to operate such sterilizer without interruption. Such act had the effect of venting the EtO directly into the atmosphere as had occurred in the early 1980’s prior to the consent order between Sherwood and the DEC.
On 175 days of the 311 days from July 1, 1987 to May 6, 1988, Sherwood initiated and completed 198 separate sterilization cycles without providing any air cleaning of the EtO emissions. The DEC learned of the unauthorized emissions when Sherwood filed a report with the DEC and the United States Environmental Protection Agency in June of 1989 pursuant to title III of the Superfund Amendments and Reauthorization Act (SARA) (42 USC § 11001 et seq.), which indicated substantial, unauthorized releases of untreated EtO directly into the atmosphere.
Ethylene oxide is a major industrial chemical, one of the top 24 in volume of production in the United States. It is classified as a "high toxicity” air contaminant in DEC’s Air-Guide 1 and has been assigned an "A” environmental rating. A substance is assigned an A environmental rating if it is an air contaminant whose discharge results, or may result, in serious adverse affects on receptors or the environment. EtO has been *284 found to cause adverse human health impacts at high levels of exposure and the EPA has listed EtO as a suspected human carcinogen. Based upon the above, an action was commenced by the DEC against Sherwood for unauthorized discharges of EtO directly into the atmosphere as such emissions violated the DEC’S air pollution regulations.
After numerous days of hearings, Administrative Law Judge Dickerson found that Sherwood’s actions violated 6 NYCRR 212.2 and 212.9 (b) because Sherwood failed to obtain emission reductions of 99% or greater, or alternatively, use the best available control technology (BACT) to regulate the emissions of EtO. In analyzing the applicable civil penalty for such violations in accordance with the civil penalty policy then in effect and the relevant statutory provisions, the Administrative Law Judge opined that while there was no demonstrated threat to human health by the petitioner’s acts, emitting a dangerous substance such as EtO without providing emission reduction of at least 99% or without providing BACT is a serious violation because of the potential for harm that could result.
The penalty provisions applicable to this violation are contained in ECL 71-2103 as follows: "1. Except as provided in section 71-2113, any person who violates any provision of article nineteen or any code, rule or regulation which was promulgated pursuant thereto; or any order except an order directing such person to pay a penalty by a specified date issued by the commissioner pursuant thereto, shall be liable for a penalty not less than two hundred and fifty dollars nor more than ten thousand dollars for said violation and an additional penalty of not to exceed five hundred dollars for each day during which such violation continues.” In interpreting this section, the Administrative Law Judge subjected Sherwood to a mixture of $10,000 and $500 máximums based upon whether or not the emissions occurred on consecutive days. By this method, the Administrative Law Judge calculated a maximum civil penalty of $581,500 and recommended a penalty of $500,000 in light of the seriousness of the violation and the absence of actual damage.
Commissioner Jorling of the DEC reviewed such decision and rendered the underlying order dated June 29, 1992. The Commissioner concurred with the Administrative Law Judge’s findings of fact and conclusion as to violations of 6 NYCRR 212.2 and 212.9 (b). With respect to the imposition of the civil penalty, the Commissioner, however, found it significant that *285 EtO is classified as a "high toxicity” air contaminant by the DEC Air-Guide 1. While the record shows that no actual adverse environmental or public health impact was likely to have been caused by the discharges, the Commissioner emphasized the potential for such impacts and the guidelines used for the imposition of a civil penalty. Thereupon, the Commissioner found that respondent "acted intentionally when it decided to shut off required air pollution control equipment rather than interrupt its operations.” (Matter of Sherwood Med. Co., June 29, 1992, at 2.) Moreover, the Commissioner opined that during each instance that Sherwood sterilized a batch of medical products in the sterilization chamber without treating the air emissions of EtO, such act constituted a separate and distinct violation of DEC’S air regulations.
In imposing a civil penalty, the Commissioner found that Sherwood violated DEC’S regulations on 198 separate occasions which was calculated as each time that Sherwood sterilized a batch of equipment without cleaning the EtO emissions. While the Commissioner determined the maximum penalty as $1,980,000, based upon a fine of $10,000 per violation, the Commissioner reduced such maximum penalty to $750,000 — $250,000 higher than that recommended by the Administrative Law Judge.
This court is asked to review only the propriety of the Commissioner’s imposition of the civil penalty. There is no dispute that ECL 71-2103 establishes a penalty schedule which provides for the imposition of a maximum $10,000 penalty for each violation of article 19 with additional penalties of up to $500 per day "for each day during which such violation continues.” The issue presented herein is whether Sherwood’s acts of sterilizing 198 distinct batches of medical equipment on 175 days must be found by the language of ECL 71-2103 to constitute a single violation which continued thereafter for 174 days or whether it was within the Commissioner’s discretion to find that Sherwood intentionally vented EtO directly into the atmosphere on 198 separate occasions, each time in violation of DEC’S air pollution control regulations, to therefore warrant the $10,000 maximum penalty each time that such emissions were made. Under petitioner’s calculations, the maximum penalty could only be $10,000 for the first day on which the DEOXX system was disconnected plus $500 per day for the following 174 days for a total maximum penalty of $97,000.
Throughout the Environmental Conservation Law it is evi *286 dent that the Legislature intended to confer upon the Commissioner a broad-based authority to implement the environmental policy of this State. One of those enumerated powers is to "provide for prevention and abatement of all water, land and air pollution including but not limited to that related to particulates, gases, dust, vapors, noise, radiation, odor, nutrients and heated liquids.” (ECL 3-0301 [1] [i].) In so doing, the Commissioner is charged with interpreting and compelling compliance with the provisions of article 19 when the Commissioner determines that the regulated community violates a statutory or regulatory obligation. (See generally, Matter of Power Auth. v Williams, 101 AD2d 659, lv denied 63 NY2d 605.)
While each side herein proffers definition after definition of what is meant by the word "continue” in an attempt to clarify the statutory language of section 71-2103 — petitioner to reduce the Commissioner’s penalties and respondent to distinguish the alleged violations as a continuous violation — this court, in the absence of a definition offered by the Legislature, is not persuaded that the natural and most obvious construction of this word through dictionary definition or otherwise, will be determinative. The real issue here is whether the Commissioner, in his expertise and in conjunction with the authority to police the environmental policies of this State, may determine that repeated violations of the same statute occurring within a set period of time, which would indisputably constitute separate violations if only one such violation occurred or if separated, as petitioner contends, by an intervening period of compliance, may be determined by the Commissioner, within his discretion, to constitute separate violations due to the nature of the violation.
The Commissioner has in the past analyzed violations of 6 NYCRR 212.2 as being repeated and continuing violations in the nature of a nuisance when such emissions emanated from the same source over a period of time. (See, Matter of Delford Indus., case No. 3-1244/8607, Apr. 13, 1989; Matter of Town of Huntington, case No. 1-1873, May 17, 1989; Matter of Arma Textile Printers, case No. 3-1224/8606, May 29, 1987.) However, in none of these cases had respondents emitted a high toxicity air contaminant which is designated as a potential human carcinogen. Hence, the underpinnings of the violation was an illegal emission which, by the nature of continuance, constituted a nuisance. While each of these decisions was accurately distinguished by the Administrative Law Judge as *287 predating the DEC’S civil penalty policy, this court found such decisions relevant in its analysis of the Commissioner’s authority to categorize a type of emission as a separate violation due to the nature of the emission, the way in which the emission occurred and the State’s underlying environmental policy in preventing such contaminants.
Pursuant to the language of ECL 71-2103, petitioner is correct in that violations deemed by the Commissioner to be of a continuing nature are assessed a lower penalty on the second or subsequent day of occurrence. The issue of whether the Commissioner may deem a series of emissions as separate and distinct violations of article 19 or any code, rule or regulation promulgated pursuant thereto and hence subject to the higher penalty structure due to the way in which such emissions occurred, are not settled by the language herein, in the proposed amendment to ECL 71-2103, or in any other penalty section cited which employs the phrase "for each day during which such violation continues.” Under any statutory construction utilizing these terms, the Commissioner may still be able to distinguish between what is a continuing violation and what is a separate and distinct violation depending upon the alleged violation, the way in which it occurred, and the civil penalty policy in effect, notwithstanding its occurrence again after the first day of noncompliance.
The Appellate Division opinion in People v Allied Health Care (174 AD2d 246) is instructive notwithstanding the later dismissal of the indictment by the Court of Appeals (81 NY2d 27). There, the Third Department sustained a charge of willful air pollution under the criminal liability section of ECL 71-2105, dismissing the argument that an operator of an existing air contamination source may, in reliance upon 6 NYCRR 201.2 (c), continue to emit air contaminants into the environment while its application for a permit was under consideration. In analyzing the distinction between the operation of an air contamination source and the actual causation or creation of air pollution, the Court there stated as follows: "Thus, it is possible to operate an air contamination source, emitting contaminants, without doing so to the extent of creating a condition posing an actual danger to human, plant or animal life, so as to meet the definition of air pollution. Accordingly, the mere authorization * * * to operate an air contamination source during the pendency of an application to operate cannot be interpreted to authorize the creation of the far more dangerous condition the regulations define as air pollu *288 tian.” (People v Allied Health Care, supra, 174 AD2d, at 251.) While the criminal indictment was later dismissed based upon due process grounds incident to a criminal prosecution, both the concurrence and the dissent still agreed with the Appellate Division’s analysis as detailed above on this issue.
Likening this analysis to that of nuisance where there is a violation which results in the continuation of emissions into the air, the penalty provisions appropriately provide for a higher single offense penalty with lower penalty provisions for subsequent dates. However, as in the case of the emission of air contaminants creating a condition posing an actual danger to human, plant or animal life — as in the case of an emission of a known air contaminant — this court cannot reason that the Legislature intended ECL 71-2103 as mandating a determination in each and every case which spans a period of more than one day of noncompliance that a single offense penalty with the lower penalty sanctions shall be the only authorized penalty.
In view of the complexity of the areas of air pollution to be regulated, this court finds that the Commissioner’s decision amply justified and defined those instances where the lower penalty provisions would appropriately be imposed as a continuing violation and then rationally distinguished the instant case: "Where individual discharges to the environment are illegal, the fact that they occur on consecutive days does not justify their treatment as continuing conditions of an initial violation. Each day the discharge occurs violates the law and carries with it the potential harms the law was intended to address. This situation contrasts with others where the violation itself is dependent upon the duration of the complained of act (see e. g., 6 NYCRR § 211.2) or where the violation involves a filing or reporting requirement that is overdue. In the latter instances, it may be appropriate to treat continued noncompliance as a continuing violation.” (Matter of Sherwood Med. Co., June 29, 1992, at 1-2.)
As demonstrated above, the Commissioner determined that after reviewing petitioner’s industrial operations and the way in which each sterilization batch occurred, that petitioner’s acts of disconnecting the mechanism and creating the environmental condition that was the subject of a consent order in the early 1980’s constituted, in effect, a blatant disregard of the air pollution regulations. Starting the process anew each *289 time it desired to sterilize medical equipment, in lieu of shutting down operations, each time consciously aware that no pollution control equipment was in place, constituted independent acts of violations which must be punishable separately.
As reasoned by Justice Casey in the concurring opinion in Matter of Judd v Constantine (153 AD2d 270): " ' "[legislative intent is the great and controlling principle” ’ in any case involving statutory interpretation, the spirit, purpose and objectives of the statute must be considered by the court * * * It follows, therefore, that the result in such a case should not depend upon whether a particular extrinsic aid to the construction and interpretation of the statute is applicable * * * It is my view that where, as here, a public officer has interpreted an ambiguous statute administered by him, that interpretation should serve as a starting point for the court’s analysis, but not as a substitute for the court’s primary focus on legislative intent, as gleaned from the wording of the statute, an analysis of the statutory scheme and, if necessary, an examination of legislative history * * * If the administrative interpretation of the statute is not consistent with the spirit, purpose and objectives of the statute, that interpretation should be rejected, irrespective of whether the administrative officer has any special expertise or whether his interpretation has been long standing.” (Supra, at 276-277 [citations omitted].)
In light of the above, this court finds that the Commissioner’s interpretation of these violations as not being of a continuing nature and therefore not within the ambit of what the Legislature intended should be defined as a continuing offense, is consistent with the spirit, purpose and objectives of the statute. In finding a rational basis to support the Commissioner’s determination, this court amply noted that petitioner’s interpretation was by no means the only reasonable interpretation (see, Matter of Duflo Spray-Chem. v Jorling, 153 AD2d 244), and therefore this court will defer to the Commissioner’s interpretation. (See, New York Pub. Interest Research Group v Williams, 127 AD2d 512.) Accordingly, the underlying decision will be upheld.
All other issues, including the counterclaim alleging nonpayment of the civil penalty, are hereby dismissed as being without merit.